UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| TASHA HODGES,<br><br>    Plaintiff,<br><br>vs.<br><br>SOUTH DAKOTA BOARD OF REGENTS,<br><br>    Defendant. | **CIV. 5:22-5011-LLP**<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is a Motion for Summary Judgment filed by Defendant South Dakota Board of Regents ("Board of Regents"). (Doc. 50). For the following reasons the Motion for Summary Judgment is granted.

## BACKGROUND

### I.    Hodges' Educational and Employment History at School of Mines and Non-Renewal of Contract

Plaintiff Tasha Hodges ("Hodges") enrolled in the PhD program at the School of Mines in 2015 and graduated from the program in December 2019. (Docs. 56, PSMOF, ¶ 1; 58, ¶ 1). Throughout this period, Dr. Bret Lingwall ("Lingwall") was Hodges's PhD advisor. (Doc. 56, PSMOF, ¶ 1; 58, ¶ 1).

In March of 2019, Hodges accepted an appointment as Research Scientist II ("RSII") in the Civil & Environmental Engineering Department at the School of Mines, effective May 22, 2019. (Docs. 52, ¶ 1; 56, ¶ 1). The Non-Faculty Appointment Notice ("Employment Contract") term was from May 22, 2019, to June 21, 2020, and the Employment Contract provided that it would automatically terminate upon expiration of the term. (Docs. 52, ¶ 2; 56, ¶ 2). The RSII position was a "50% effort" position with a salary in the amount of $28,600 for the 12-month term. (Docs. 56, ¶ 3; 56, ¶ 3). Hodges's position was funded by a grant from the National Science Foundation ("NSF") for research relating to "The Role of Multi-Scale Porosity on Termite Mound Behavior" ("Termite Project") for which Lingwall was the principal investigator. (Docs. 52, ¶ 7;

56, ¶ 7). The position was also designated as "exempt from Fair Labor Standards Act (FLSA) and therefore not subject to overtime." (Docs. 52, ¶ 4; 56, ¶ 4).

At the time Hodges accepted her position as RSII, Hodges was still completing her PhD and thus there was some overlap where she was completing her PhD program and working as an RSII until she graduated in December 2019. (Doc. 52, ¶ 5; 56, ¶ 5). Hodges testified that she worked at least 40 hours a week during this time. (Doc. 55-1, Hodges Dep. 17:22-18:9). Hodges testified that she wrote papers for her dissertation work, trained and mentored students, helped with proposals, maintained the lab, presented research at a conference, and did outreach events such as girls' science day. (Doc. 55-1, Hodges Dep. 21:20-22:10). Hodges testified that Lingwall would tell her that these other things were for her own benefit, but she felt like he was requiring them. (Doc. 55-1, Hodges Dep. 22:19-21). Hodges testified that "he put excessive workloads that nobody could reasonably get done in a 20-hour time frame," although she never said that he specifically required her to work more than 20 hours a week on the Termite Project. (Doc. 55-1, Hodges Dep. 22:21-23). Hodges testified that Lingwall would mock people if they thought they only had to work 20 hours a week in their position and that it was understood by her that she would have to work more than 20 hours a week if she had any hope of succeeding. (Doc. 55-1, Hodges Dep. 19:11-17). Lingwall testified that although activities such as paper writing were not part of her assigned duties as a research scientist, preparing publications and documents was related to Hodges's PhD research which Hodges was engaging in and for which she was paying for research credits. (Doc. 55-2, Lingwall Dep. 39:11-40:18). Additionally, Hodges testified that Lingwall would assign her tasks with unrealistic deadlines. For example, Hodges testified that he was assigned a task at 10:44 p.m. on July 3rd which was also her anniversary and was given a deadline of 8 a.m. on Friday morning which would require her to work over the entire Fourth of July. (Doc. 55-1, Hodges Dep. 22:23-23:2). Hodges stated that the assignment was a paper being submitted of her research that she was not given advance notice of and that she should have been given a lot more notification and input on what was in the paper. (Doc. 55-1, Hodges Dep. 23:1-7). Hodges also said that Lingwall gave her almost all the students to supervise and that during the summer when she was trying to finish up her dissertation, she had to train and supervise an undergraduate student approximately 20 hours a week in the lab. (Doc. 55-1, Hodges Dep. 25:5-26:9). Hodges testified that Lingwall took the undergraduate on as a mentor, received credit for her mentoring, but that she did all of the work. (Doc. 55-1, Hodges Dep. 25:5-26:3).

2

From May 22, 2019, to December 21, 2019, Hodges was paid $2,383.33 on a monthly basis. (Docs. 52, ¶ 8; 56, ¶ 8). The FLSA's salary threshold for exempt employees was due to increase from $1,971.66 per month to $2,964 per month. (Docs. 52, ¶ 9; 54, ¶ 9). Because Hodges's salary fell below the threshold, Hodges was reclassified as a non-exempt employee beginning with the December 22, 2019, pay period and was instructed to begin submitting an hourly timesheet with her hours listed for approval by her supervisor. (Docs. 52, ¶¶ 9, 10; 56, ¶¶ 9, 10; 53-7 at 507). Hodges graduated in December 2019, having completed her PhD. (Docs. 56, PSOMF, ¶ 1; 58, ¶ 1).

On or about February 13, 2020, Lingwall requested that Hodges be moved to a 40-hour a week position. (Docs. 52, ¶ 12; 56, ¶ 12). The Termite Project grant from the National Science Foundation would support 50 percent of her pay, and a United States Army Corps of Engineers grant would fund the other 50 percent of her salary. (Docs. 52, ¶ 13; 56, ¶ 13; 59-1 at 893-902). The Army Corps grant was for the Ellsworth Pond Stabilization Project ("Pond Project") for which Dr. Lisa Kunza was the principal investigator. (Docs. 52, ¶ 14; 56, ¶ 14).

On March 11, 2020, Hodges and Lingwall completed Hodges' performance evaluation. (Docs. 52, ¶ 17; 56, ¶ 17). Of the 13 categories for which Lingwall provided a rating in Hodges' performance evaluation, he rated Hodges "Exceptional Performance" or "Successful Performance-Plus"—the top two ratings—on 12 of those categories. (Docs. 52, ¶ 19; 56, ¶ 19; 55-5). In 1 of the 13 categories ("Leadership Skills), Lingwall thought Hodges consistently met all expectations and was a solid contributor. (Doc. 55-5). Lingwall noted that Hodges "mentors and supervises as well as or better than her peers in academia, but needs to improve in resources management (persons, materials, and equipment)" and noted that she "needs to make minor improvements to her leadership role in the research group and the department." (Doc. 55-5). In her performance evaluation, Hodges indicated that her 2020 goals were:

1. Goal 1 - BioCaN: There are 3 large-scale multi-stage factorial designed experiments that need to happen this year. Our goals is to have these done by end of summer.
2. Goal 2 - Proposal writing: Help write 2 proposals for Dr. Lingwall's research group and other campus research efforts.
3. Goal 3 - Paper writing: Submit two journal papers as primary author.
4. Goal 4- Leadership: Work on transferring and sharing responsibilities in laboratories and other shared workspaces. Dr. Lingwall has agreed to help mentor and develop solutions and strategies. This involves putting priority on her own accomplishments rather than being the person others rely and expect things from.

5.  Goal 5 - Learning how to manage work timing and expectations with a very flexible job and communicate work timing with others to optimize productivity. We need to set better project expectations and timing and communicate better on managing the extremely flexible, novel and unique nature of research we are doing. This is a joint goal between the two of us.

(Doc. 55-5). Lingwall testified that the goal of proposal writing was to allow Hodges to "learn how to write proposals to gain research funding" and to secure funding to support her continued employment. (Doc. 53-5, Lingwall Dep. 71:15-72:6). In addition, the performance evaluation set forth the further goal of funding her position:

> [Hodges] understands that after October 2020, we will need additional funds to keep her at full-time (100% FTE). Therefore she and I are both committed to proposal writing and research development activities to develop the funding streams necessary to keep her at 100% FTE beyond October 2020.

(Docs. 52, ¶ 18; 56, ¶ 18; 55-5). In Hodges's performance summary, Lingwall wrote:

> Tasha has met or exceeded expectations in all areas and has had successful performance over the 2019 period. She has room to improve in all areas of performance. However, Tasha is growing as a researcher and is well on her way to becoming either faculty or an RS III. Her goals for this year will help her get there.

(Doc. 55-5).

Before Hodges could begin work on the Pond Project, Hodges was required to study the workplans related to the project and complete the 40-hour hazardous materials training known as HAZWOPER training. (Docs. 52, ¶ 37; 56, ¶ 37). At 50% effort, Hodges told Lingwall in an email that these initial requirements would keep her busy for 2-3 weeks. (Doc. 55-20 at 806).

At the start of the COVID shutdown, Lingwall and Hodges implemented a Monday Update policy where Hodges would send an update to Lingwall on her projects each Monday. (Docs. 56, ¶ 31; 58, ¶ 31). On March 16, 2020, Hodges emailed Lingwall with her third Monday update on her work. (Doc. 53-8 at 567-68). In the email, Hodges stated that she had very few hours left to work that week because she was far over the 20 per week average for the pay period, but would likely work some extra hours as she typically did. (Doc. 53-8 at 567). Hodges also mentioned that she had not heard from human resources yet about approving her for full-time status, questioned whether human resources was too preoccupied with addressing COVID-19 to approve her at full time, and asked whether she should hold off on Hazwopper training until she officially started work on the Pond Project. (Doc. 53-8 at 567). In the email, Hodges said she had ordered

4

herself a new computer that would work well for research and modeling. (Doc. 53-8 at 568). She outlined the following workplan:

TWO WEEK TASK SCHEDULE

This first week as the campus is shut down I will try to get the data from Savannah and Ben and then put it together with my previous burned soils data and Andrew's data and analyze the burned soils data.

The second week will be writing on the burned soils paper and finishing up data. As I am working on it I will determine if other laboratory/field data is needed for the paper. This will also likely require a more extensive literature review than I currently have.

Minor tasks:

- Keep up with emails
- Get onto databases and papers for both termite project and af project and review all documents
- Get new computer setup and ready to work from (VPN, office suite, school network drives, other software downloads, file transfers)

Tasks on the horizon:

- Final design and materials list for rainfall experiments
- Hazwoper (unless you want to move this up in priority)
- Final design of chemical characterization and soils experiments to determine 3D print additional needs for sample trays
- Perform an extensive lit review on upcoming projects
- Download modeling software for termite project and learn software
- Once sent to me, review Andrew's QA/QC plan for lab compliance with foreign soil permits and make materials list and finalize laboratory plan
- Make sure I do the refresher wildland firefighter training
- Backup research files and pictures (done monthly-1st Monday)
- Archive files

ONCE BACK IN LAB

-Autoclave testing

-Dispose of termite packaging materials (Hannah)

- Setup work/sanitization stations for termite projects, make sure everyone working on project is aware of plan and also initials the permits

- Build rainfall experiments

- Load cups for rainfall

- Treat BioCaN chemical samples (3D printed trays)

- Treat BioCaN rainfall samples

- Carry out laboratory testing

- Start prepping BioCaN vegetation samples

(Doc. 53-8 at 568-69).

In his response, Lingwall did not address Hodges's email question about whether to begin Hazwopper training, but stated that the hold up on full-time approval was payroll. (Doc. 55-3 at 687). Lingwall and Kunza had approved of paying Hodges for her part-time work on the Pond project in mid-February 2020. (Doc. 53-7 at 505-06). It appears from the record that it took quite a bit of back and forth between all the project participants, the department, human resources, and payroll before Hodges was officially approved for work on the Pond Project. (Doc. 59-1 at 893-902). As Lingwall explained to Hodges in his March 17, 2020 email, part of the hold-up was due to the fact that Hodges' annual leave was not accounted for in the proposal budget by OSP and Hodges' total compensation exceeded the initial budget by $300. (Docs. 55-3 at 687; 59-1 at 893-902).

On Thursday, March 19, 2020, the School of Mines notified the campus community via email that it would be suspending on-campus operations until March 27, 2020, due to COVID-19 pandemic concerns. (Docs. 52, ¶ 20; 56, ¶ 20; 53-8 at 518). Lingwall sent an email to Hodges and colleague Hannah Moen, informing them that:

> We have asked for permission for you both to use labs as needed since we are under contracts with fixed end date and you are both thus essential employees. However, please minimize campus access. I am not going in much myself, and probably won't for the foreseeable future. However, lab work still needs to be done! My sense is that Dr. Duke's lab will be closed next week. Please ping me when you are heading to campus so that I can let Dr. Kenner know someone will be accessing the building. They are tracking entry and exit with video!

(Doc. 53-8 at 518).

Moen responded via email to Hodges and Lingwall stating that "with Dr. Duke's lab probably closed, I won't be on campus much, except maybe to work on DNA extraction." (Doc. 55-20 at 807). Hodges responded:

> I have more than enough to keep me busy with data analysis, writing, background research and modeling for lots of time to come, if needed. Also, if I start full time I have hazwoper to keep me busy on that project for 2 weeks plus reviewing documents could push that another week or so.

6

> I'm kinda with Hannah in that the lab stuff that's most essential would be DNA, XRD and SEM however I am guessing BH is closed as well as Dr. Duke's lab so not much we can do. Any lab experiments I have, aside from above mentioned, require extensive time in the lab and most of them require going in pretty much 7 days a week to get them going and to do data collection. I will also need to start them when I can do ordering and have Forest available to help. I don't think they would like me going in as much as I would need to. So long story short, I don't think I will be going in much.

(Doc. 55-20 at 806).

Scott Kenner, Professor and Head of the Civil and Environmental Engineering Department at School of Mines sent an email on March 20, 2020, to certain personnel within School of Mines seeking to approve certain students as essential personnel to continue working in the lab during the school closure. (Doc. 53-8 at 522). He stated that persons in the department had agreed that no cost time extensions could be requested for ongoing lab experiments or currently funded projects and expressed that "funds expended on assistantships etc cannot be recovered" and thus some key experiments will need to continue. (Doc. 53-8 at 522).

Later that day, Lingwall informed Hodges and Moen that they were approved to work in labs as needed going forward and referred them to the lab protocol from administration if they do so. (Doc. 53-8 at 521). One administrative email stated:

> Please make sure your students using lab facilities understand the severity of this situation as we strive to continue our work. I will leave it to you as supervisors to determine to what extent your students 'need' to be in the laboratory.

(Doc. 53-8 at 521). Another email Lingwall shared with Hodges and Moen stated that:

> We should be clear that this is not business as usual. The students should be accessing the facilities as little as feasibly possible. Each time they enter they should be cleaning all touch surfaces before departing including door knobs, lab benches, etc. If more than one person is in the lab they should separate to the extent possible. If anyone is the slightest bit feeling ill then they should not come in and should stay home.

(Doc. 53-8 at 521).

Hodges responded to Lingwall's email asking if he had something specific he was wanting them to work on in the lab, and indicated that she did not have any experiments going on at the moment that needed to be checked and that she had plenty of non-lab tasks to keep her busy. (Doc. 53-8 at 520). Lingwall responded that "[i]t's open ended for you to choose your workplan as you

7

want," that they wanted to make sure she could "do what you need to do when you need to do it." (Doc. 53-8 at 520). Lingwall stated that "if you don't need to do any lab work for two weeks, no problem. However, my guess is that this will be longer than a few weeks, so I want you to have the ability to get into the lab if this extends for many more weeks." (Doc. 53-8 at 520).

On March 24, 2020, Hodges received an email from Kelsey O'Neill, Associate Vice President of Human Resources, confirming that she had processed the request to change from a half-time employee to a full-time employee and notifying Hodges that she would be changing to a salaried rather than hourly employee and would be reclassified as exempt because her new weekly salary was greater than the FLSA minimum weekly income for salaried employees. (Docs. 53-8 at 523; 52, ¶ 16; 56, ¶ 16). With the change to exempt status, Hodges was informed that her timesheet will be a leave sheet, where she would only have to mark leave taken (personal, annual, sick) rather than hours worked. (Doc. 53-8 at 523). Effective March 22, 2020, Hodges was paid 40 hours a week at her current rate of $27.50 per hour and associated fringe benefits, and half would be billed to the Termite Project grant and half would be billed to the Pond Project grant. (Docs. 52, ¶ 13; 56, ¶ 13; 53-7 at 504-07).

On April 6, 2020, approximately two weeks after she was informed of her full-time status approval, Hodges sent a Monday update email to Lingwall. (Docs. 56, PSOMF, ¶ 31; 58, ¶ 31). In her update, Hodges informed Lingwall:

> UPDATES:
>
> Well, it has been a little difficult both getting into a full-time routine and more so a quarantine routine. As you know, I went to the lab and did inventory. It was very uncomfortable on campus and I really get the feeling they don't want us there so I think I should stay out of the labs for at least the next two weeks. Especially since these two weeks are heading into the worst of the pandemic. The campus had signs everywhere, doors taped shut, cameras rolling and all doors locked. Not a welcoming environment so I think the best route is to stay away for now. Also, I don't know what happened in my office but it was about the dirtiest it had ever been so I spent some time cleaning and disinfecting my desk and shelves.
>
> To properly design the rainfall experiments I really need to go shopping at hardware stores because it is so much easier to find what I am looking for as opposed to online shopping. Now is not the time to go out shopping so that experiment will also have to go on hold.

I used to work on many projects in construction and had devised a way for personal optimum work efficiency. I worked pretty hard on a similar system that I hope will work for my current work position and I implemented a beta version last week. I say beta because it is somewhat evolving but I really hope with this system in place it will up my work efficiency so I don't feel like I am spinning wheels in mud all the time.

Just so you remember Kristi Noem gave us admin leave on this coming Friday and Monday for Easter so for the most part I won't be working those days though I may do some stuff. I most likely will not be checking email during the long weekend.

- Received burned soil data from undergrads and began compilation with previous data
- Lab inventory and supply list
- Autoclave testing was completed (Forest and Margaret)
- Designed a personal work efficiency plan for going forward
- Get onto databases and papers for both termite project and af [pond] project
- 3D Print termite model

## IN PROCESSING AND CONTINUING

- **Hazwoper training – no idea how close I am to finishing (it doesn't really give time progress) but I will be focusing efforts here for at least the next week maybe two to finish up**
- Document review from Lisa's [Kunza] onedrive for AF [pond project]
- Burned soils data analysis, laboratory planning, literature review and paper writing
- Comprehensive list of experiments completed, experiments to complete and data compilation spreadsheets for BioCaN (this will make upcoming papers so much easier)
- Continue document review on project dropbox folder for termites
- A laboratory todo work list is being maintained for once I am able to get back into the lab
- Catch up on emails

## TASKS

- Backup research files and pictures (done monthly-1st Monday)
- Download better virus protection software, connect to VPN, connect to networks, download additional software such as Rhino
- Increase my understanding of biosafety cabinets and fume hoods

## TASKS ON THE HORIZON

- Comprehensive list of experiments completed, experiments to complete and data compilation spreadsheets for Termites
- Final design of chemical characterization and soils experiments to determine 3D print additional needs for sample trays

9

- Perform an extensive lit review on upcoming projects
- Download modeling software for termite project and learn software
- Review Andrew's QA/QC plan for lab compliance with foreign soil permits and make materials list and finalize laboratory plan
- Archive files, digital and hard copies

ON HOLD

- Final design and materials list for rainfall experiments
- All laboratory work

**TWO WEEK TASK SCHEDULE**

COMPLETED FROM LAST UPDATE

- Received and setup new computer and downloaded some software

(Doc. 53-8 at 524-26). On April 7, 2020, Lingwall responded to Hodges via email, thanking her for the update and stating that it "[l]ooks like you are using your time well." (Doc. 53-8 at 524). Lingwall responded that:

> The pressing tasks aside from the 40-hour training are 1) updates and revisions to the TRB paper (Due next week); 2) The carbon sequestration EAGER proposal. You can read more of the details on the solicitation here . . .; 3) getting up to speed on Multiphysics modeling and the various software package options; and 4) obtaining samples of geomembranes for our PFAS lab work. I wouldn't spend too much more time reviewing termite literature except for where the papers deal with air flow or heat transfer.
>
> The PFAS lab supplies are arriving this week, and we should have a lab up and running next week. Once we have a lab running, we will prepare a rotation schedule for folks to be in the PFAS lab with minimal to no contact with others. I'll schedule a meeting next week for that kick-off lab work with you and Rashed once we know more from the chemists on their proposed treatments. The chemists should have their formulas nailed down late next week, so we are about 14 days away from being in the PFAS lab. Therefore, there is some urgency in getting the geomembrane samples from the manufacturer.

(Doc. 53-8 at 524).

At the beginning of April 2020, Hodges was invited to assist in drafting a proposal for grant funding to the National Science Foundation. (Docs. 52, ¶ 23; 56, ¶ 23). The proposal was known as the EAGER proposal or project. (Docs. 56, ¶ 23; 56, ¶ 23). Lingwall testified that since students were not in the labs as much during COVID, faculty had been instructed by the vice-president of research that students should help on writing proposals so they could develop those skills and be working on stuff because the students were being paid. (Doc. 59-4, Lingwall Dep. 109:12-110:8).

Lingwall testified that with "COVID shifting everything around, and again, we had this earlier discussion about how if we can't be in the lab, we need them working on things. So we are going to give assignments that aren't kind of like those baseline assignments to try to fill the gaps." (Doc. 59-4, Lingwall Dep. 109:12-110:8).

There were at least 5 individuals working on the EAGER proposal in total, 3 men and at least 2 women. (Docs. 52, ¶ 25; 56, ¶ 25). Lingwall, Dan Soeder, and Rajesh Sani were the males working on the proposal and Hodges and Gokce Ustunisik were the females working on the proposal. (Docs. 52, ¶ 26; 56, ¶ 26). Lingwall, Ustunisik and Sani were professors at the School of Mines and Soeder was a consultant and former employee of Lingwall's. (Doc. 55-1, Hodges Dep. 111:16-23; 59-4, Lingwall Dep. 109:12-25). Lingwall, Ustunisik, Sani, and Soeder were all co-principal investigators for the EAGER project. (Doc. 59-4, Lingwall Dep. 109:15-17). Hodges was not a co-principal on the project, but was invited to assist with the drafting the proposal to gain experience. (Docs. 52, ¶ 25; 56, ¶ 25).

Lingwall testified that he invited Hodges to participate in order to give her proposal writing experience "so she could see the ins and outs of what a proposal looks like to National Science Foundation, what the forms look like, to try to get a sense of what proposing science looks like, which is different than reporting science." (Docs. 52, ¶ 23; 56, ¶ 23; 53-5, Lingwall Dep. 110:2-8). The EAGER project would also enable Hodges' position to be funded after funding ran out on other projects. (Docs. 52, ¶ 24; 56, ¶ 24). Lingwall testified that in addition to Hodges, another "trainee" was brought in to help with the proposal, Tanvi Govil, who was also a female. (Doc. 53-5, Lingwall Dep. 110:2-24). Hodges disputes that Govil was part of the drafting or email correspondence for the EAGER proposal and asserts that there are no documents or emails relating to the EAGER proposal that copied Govil on them. (Doc. 56, ¶ 25).

Hodges testified that she did not understand why she was not listed as a co-PI on the project. (Doc. 55-1, Hodges Dep. 110:21-111:8). Hodges testified that she was giving ideas for the proposal. (Doc. 55-1, Hodges Dep. 110:21-111:8). She testified that it appeared from the solicitation that part of the reason the group was invited to write the proposal was due to the team's recent success with biomineralization. (Doc. 55-1, Hodges Dep. 110:21-111:8). Hodges testified that she was the only one working in the labs on biocementation on campus at the time and believed the proposal was largely based on her work, but that she was "not being provided any protections

11

on the proposal because Lingwall was not putting her name on it." (Doc. 55-1, Lingwall Dep. 110:18-111:8).

The first group meeting for the EAGER proposal was on April 9, 2020. (Doc. 53-5, Lingwall Dep. 111:10-21). In Lingwall's notes from the meeting, he had indicated that the proposal was due on May 15, 2020, which meant that the proposal contents must be uploaded to the National Science Foundation's FastLane website and all errors resolved by a certain time given on the solicitation by the United States Government." (Doc. 59-4, Lingwall Dep. 111:22-112:5). However, a few days before the due date, on May 11, 2020, a final draft of the EAGER proposal would need to be forwarded to the Office of Sponsored Projects. (Doc. 59-4, Lingwall Dep. 112:6-21). Lingwall testified that faculty and researchers are not allowed to submit their own proposals. (Doc. 59-4, Lingwall Dep. 112:10-12). All proposals must be submitted through the Office of Sponsored Programs "so there's not renegade research projects happening on campus so all the money that's coming in is properly accounted for." (Doc. 59-4, Lingwall Dep. 112:12-15). Lingwall testified that Office of Sponsored Projects had to have all of the team's documents to get internal approvals and to get everything uploaded, and that this was "the process for which Tasha was supposed to be gaining experience." (Doc. 59-4, Lingwall Dep. 112:17-18). Lingwall's notes indicated that the team would start writing on April 16, 2020. (Doc. 59-4, Lingwall Dep. 114:20-22). Hodges was "assigned to provide a brief background about the experimental mine, EMS, the engineering and mining experimental statement and the instrumentation capabilities of the campus facility so that [they] could include those in [their] facilities and instrumentation section of the report. And she was also supposed to give perhaps one paragraph summary of biocementation, which was the topic of her dissertation." (Doc. 59-4, Lingwall Dep. 114:12-19).

The parties dispute when the deadline was to turn in a draft of the EAGER proposal to Lingwall. Lingwall's notes from the kick-off meeting said "start writing April 16." (Doc. 59-4, Lingwall Dep. 112:25-113:1). Lingwall testified that this meant that the team "would have a shared Word document on a shared folder [and] that everyone should have all of their preliminary text added to that document on April 16th. So the shared document begins April 16th. But other writing assignments were given in the meeting." (Doc. 59-4, Lingwall Dep. 113:3-7). Lingwall testified that during the April 9, 2020 meeting, the team decided on what tasks they would complete over the next week. (Doc. 59-4, Lingwall Dep. 113:12-20). Hodges testified that her

understanding during the meeting was that they were going to start writing on the EAGER proposal starting April 16, 2020, approximately one week from the kick-off meeting, and that she would have the week to tie up some other things and get a little familiar with the project before starting. (Doc. 55-1, Hodges Dep. 115:10-24).

On April 10, 2020, at 4:19 p.m., Lingwall sent an email with the link to the OneDrive shared folder. In the draft, two paragraphs were highlighted and Hodges's name was next to those paragraphs. (Doc. 53-8 at 528, 527). The other team members copied Hodges on the responses to their writing assignments and Lingwall uploaded them to OneDrive. (Doc. 53-8 at 528, 527). At 6:15 p.m. that day, Hodges was also sent an email asking for several forms to be completed and returned. (Doc. 53-8 at 528-29, 527).

On Friday, April 10, 2020, before the Easter weekend at around 5:30 p.m., Hodges emailed Lingwall a draft of the TRB paper. (Doc. 55-12 at 775). In her email to Lingwall she stated:

> I was not able to get to the abstract rewritten, although I rewrote a sentence that came later in the document that could be worked from for the abstract which I copied below the abstract. I also did not get to a thorough edit of the results or discussion section, one reviewer did state they got lost in the results section so it might need work. I thoroughly edited the first few sections as requested by the reviewers but it wouldn't hurt to get a second set of eyes on the edits I made.
>
> I also attached the email with reviewer comments with tasks completed checked in red.
>
> I changed how you had the page numbers for ease of editing. I wasn't sure why all the pages had -14- on them (maybe it was a technical thing?) so if that was necessary you will have to change it back.
>
> Any tracked changes in the document are there for you to look at as well as any comments. Edits I made for the editorial board and reviewers are highlighted in yellow as requested. Although I did slightly resize a couple figures without highlighting in yellow and maybe missed some changes but I tried to be sure to highlight all changes as best I could.

(Doc. 55-12 at 775-76).

On Tuesday, April 14, 2020, Lingwall emailed Hodges stating that revisions to the TRB paper were nearly done and that he was planning to submit the paper the next day. (Doc. 55-12 at 774). At around 11:00 a.m. that day, Lingwall asked Hodges to finish the abstract because he had not worked on that yet. (Doc. 55-12 at 774). At around 1:30 p.m., Hodges emailed stating that the abstract was at 450 words, longer than before, and asked if there was a limit on abstract length.

(Doc. 55-12 at 773). She submitted a draft to Lingwall via email at 2:20 p.m. (Doc. 55-12 at 773). Lingwall responded immediately stating that the length requirement was very short, 250 words and that it was why the initial submission was so short. (Doc. 55-12 at 772). Hodges began work on revising the abstract down in length. (Doc. 55-12 at 772).

On April 15, 2020, after the TRB paper had been submitted, Lingwall thanked Hodges for her edits and revisions, responded "really good stuff," and asked if she would like to write another paper. (Doc. 55-12 at 769). Hodges responded that she was planning on the burned soils paper next, asked if Lingwall had a different one in mind and stated that "it probably wouldn't be bad to start another one or two and write concurrently." (Doc. 55-12 at 769). Lingwall responded that he was conducting some burn experiments in his yard, and that he will be "sketching it up for [Hodges] in the next week along with the iterations of the factorial design." (Doc. 55-12 at 769). Further, Lingwall stated:

> Whatever paper you'd like to do is fine with me. We need a little more data for each of them.....so it really depends on how much lab work you can/want to do right now, plus the early writing efforts of literature, background, etc.

(Doc. 55-12 at 769).

It was Hodges's understanding from the April 9, 2020, EAGER proposal kick-off meeting, that the group would not begin writing until April 16, 2020, so that they would have a month until the due date to complete the proposal. (Doc. 58, ¶ 71). Although Hodges was being copied on the emails from her colleagues with their writing assignments, Hodges did not see those emails. Hodges testified that although she had seen the April 10, 2020, assignment emails sent by Lingwall, she "pinned" those emails which resulted in the email being put in different place in her email inbox and she was thus not notified by the replies to the email by her colleagues. (Doc. 55-1, Hodges Dep. 116:23-117:4).

Hodges testified that Lingwall scheduled a follow-up meeting for the EAGER proposal team on April 20, 2020. (Doc. 55-1, Hodges Dep. 116:6). Gokce, the other female working on the team, responded that she was unavailable to attend then because she had one of her students defending at that time. (Doc. 55-1, Hodges Dep. 116:6-116:10). Hodges testified that Lingwall replied that "I saw you had that, great stuff," and went forward with the meeting anyway despite Hodges indicating in an email that she would be happy to change the meeting time to allow the whole group to meet together. (Doc. 55-1, Hodges Dep. 116:6-22). At the April 20, 2020 meeting,

Hodges stated that Lingwall called her out in front of the other male team members attending the meeting for not having her assignment completed. (Doc. 56, ¶ 72; 58, ¶ 72). Hodges testified that she believes Lingwall intentionally conducted the meeting without Gokce to single her out in front of her male colleagues and that she "felt very disrespected in front of the men." (Doc. 55-1, Hodges Dep. 116:6-15).

On Tuesday, April 21, 2020, Lingwall sent an email to Hodges about her contribution to the EAGER proposal. (Doc. 53-8 at 530). He described that her summary of biocementation should be about 750 words and detailed what it should cover. (Doc. 53-8 at 530). Her biocementation piece should also include 15 references. (Doc. 53-8 at 530). Lingwall stated that Hodges's engineering and mining experimental statement and the instrumentation capabilities of the campus facility was to be 250 words and should demonstrate that the lab has all the toys and tools needed to study mineralization. (Doc. 53-8 at 530). On Friday, April 24th, Hodges replied:

> That's a lot which would result in 2-4 pages. Isn't the proposal only allowed to be 8 pages. It is normal for someone to write 25-50% of the proposal if they aren't even a co-PI? I won't even get credit for the funding.
>
> To be honest I also have extreme doubts if I will be able to accomplish the extensive lab work needed in only 2 months time per year which would result in 6-7 hrs a week. Is that the time structure planned or it this two consecutive months? By my estimates I would need to spend at least 20 hours a week on this for the two years to accomplish training, advising and task planning for a graduate and undergraduate, lab setup, microbe identification, chemical process identification and experiment planning including finding a high temperature and pressure chamber that will work, conducting the experiments including specimen preparation, treatments, CO2 injections, heat and pressure testing, flashing-freezing, DNA and RNA extractions, microbiome cataloging, SEM/EDS, XRD, other testing and so on. I don't want to get into a project where we promise more than can be deliver. Do you have a plan indicating that is all the lab time that will be needed?

(Doc. 53-8 at 530). Lingwall responded that:

> I will pair the text down and make it fit with everything else. You are not writing the bulk. In fact, your text will end up being only 15% of the total writing effort. I am writing 70% of the text, so…..what is fair is an interesting question for another day. Your text is now the critical path. I have all the other pieces.
>
> Dr. Sani is doing much of the microbe identification work. He is taking care of the UG. Dr. Gokce is taking care of the graduate student. Your role is to handle the culturing and inoculation steps, and then to coordinate the SEM and XRD work on

the back end. Sani and the UG do all the identification and genomics and development and culturing protocols. Gokce and the PhD student do all the geochemistry experiments. The division of labor works out pretty well. You are not the advisor to the other researchers, so your time is simply the lab time for those specific items. You will have to be efficient, but these numbers are quite reasonable for an expert working efficiently.

I need your text ASAP so I can finish the draft. Once you see the entire draft this will make more sense and you can see your role and time commitment in more detail.

(Doc. 53-8 at 529-30). Lingwall stated further in his email that:

I am specifically scoping your effort for the number of hours we are proposing for your time. We need to have 2 or 3 projects rolling at once to have you funded full time long term, and this would be but one of those projects. Therefore we have to be sharp about your effort and productivity on each project. A giant pile of money to work exclusively on one project for three years is unlikely for any of us to achieve.

(Doc. 53-8 at 529-30). That same day, Hodges responded to Lingwall, saying:

I will work on it and get it to you. In the future I would really appreciate more respect. If you need me to do something I would really appreciate better communication. You told me you were expecting something from me on a Zoom call in front of others by telling me you were still waiting on my portion when I really had no idea I was even supposed to have had something to you.

(Doc. 53-8 at 529). Lingwall responded to Hodges by saying:

Dear Tasha,

A couple of points of order. You were not singled out in any meeting. Everyone in the virtual room was asked to give a report of their assignments. I went first and gave my updates of things done and things not done. You'll note that I had items not completed that I had agreed to do that I willing (sic) admitted to the group and provided a path forward on my deficiencies. Dan was asked next, followed by Rajesh. Both had report of things done and not done. Your turn came. We have followed the same format in the Termite Project meetings. This is a standard format for a team meeting. I am treating you with the respect of a peer. If a working group of peers is reporting to each other, everyone has to give their report. If you have not made your deadline, peers admit it to their colleagues. We all miss deadlines. It happens. The burden of being a member of a team of professional peers is having to take responsibility.

If you have questions on assignments, I need to know your questions! I cannot know what you did or did not understand in a request! It is the custom in our industry to seek clarification within 1 or 2 working days. We have discussed this in the past.

Now, as far as assignments on this particular effort, the requests have been specific:

- Our meeting was April 9th, an assignment for two paragraphs was made. You agreed to that assignment verbally in the meeting. An assignment for two forms to be completed was also made, and you likewise agreed to those forms. In the meeting, a one-week deadline was provided for all participants for both the writing assignments and for the forms.

- On April 10th, 4:19PM, you were sent an email with the link to the OneDrive folder, as was discussed in the meeting, and to find your writing assignments in the draft. In that draft, two specific paragraphs were highlighted and your name was associated with those paragraphs.

    o Your collaborators copied you on their responses to their parallel writing requests, and I uploaded them to OneDrive so you could see them at your convenience. They did that as a courtesy to you so that you could see their responses and you could know what needed to be done. We provided this courtesy to you as this is your first proposal and we wanted you to see their contributions so you could emulate.

    o I never received an acknowledgement from you on this email or any discussion from you on trouble finding the file or the assignment. All other members of the team sent me an acknowledgement.

    o You didn't ask for clarification on any writing assignment until April 21.

- On April 10th, 6:15PM, you were sent an email asking for several forms to be completed and returned. These have not been completed or returned to me.

    o I have not received any questions from you on these forms.

    o I have never received a reply from you acknowledging this request.

    o Your peers have been copying you (and uploading to OneDrive) with their completed forms, again so that you could see what they did, as a go-by for you to see how to do them

- On April 20th, a follow up meeting was held, 10 days after the initial request and three days after the requested deadline. At this time, the entire group was held accountable to each other on their progress. In collaborative teams we are all accountable to each other.

- We will have a May 1 meeting, where each individual will again be held accountable to the group on their assignments.

All that said, I really do need to know when you will have the writing assignment and forms completed.

My deadline to the group to have the draft proposal done is today. I have to admit to the group that I am late. This puts pressure on me to work all weekend on this proposal. So....I will be working all weekend on this proposal so that the team can review and comment for our May 1 meeting.

(Doc. 53-8 at 528-29). Hodges responded with the following email:

I guess your response is about what I expected. I disagree with the points in your outline as I was not at all aware of my assignment. I just wish every now and then

you wouldn't always blame me for everything and occasionally give a sorry or a thank you. Or some kind of admission that I am not always the problem and you can mess up too.

(Doc. 53-8 at 527-28). Lingwall responded:

Hi Tasha,

So did you not get the emails I sent with the instructions? I need to know if communications are not getting to you. From time to time emails don't come through. Can you confirm that the referenced emails were received? This is essential for me to know how to improve communication. If email is not reliable, we can use other means. So seriously, did those emails with instructions not get to you? If not, I need to work with IT on making sure that emails are coming through.

I mess up all the time and am continually seeking to improve. I have many times freely admitted to you my errors or mistakes, yet you never seem to hear my admissions of fault. If I err in not setting expectations for you, I apologize profusely. I'll be better at expectations from now on. You can rely on that. Expectations will be clear. I want to help you reach your potential as a researcher. I really do. Now, all that said, do you have a timeline for the writing assignment and the two forms? I need those by Monday at 5:00 PM at the latest. I hate to close with business, but now that you are aware of the assignments and the deadline and the resources.....

Thanks,

And do have a great weekend!

(Doc. 53-8 at 527). Hodges responded:

So I looked and the two emails did come through. I had saw (sic) the OneDrive folder, but hadn't even looked at it until after the 1st meeting. I apologize for that. The second email sent 4/10 at 6:15 I just saw right now for the first time. So many emails get so lost, I'm horrible at finding them. I try to keep organized but don't do a good job. I misunderstood in the 1st meeting and had thought you said we wouldn't even get started until the 16th so I thought we had more time. I have always disliked email and video conferencing so this is really not good for me and I am trying to get everything figured out. I will do everything I can to try to get them to you by Monday at 5pm.

(Doc. 53-8 at 527).

Also on Friday, April 24, 2020, at 4:27 PM, Hodges sent an email to Lingwall with the subject-line, "COVID-19." Therein, she stated:

Dear Bret,

> This virus has bene difficult on us all. I feel little like you pretend it isn't going on and have ignored many of my concerns over the last month or so that I sent in email. I understand it is probably very tough on you as well but I need you to understand how tough it has been on me. Probably the toughest part of all is how much more difficult productive communication between us has gotten. We need to figure something else out because we have never done well with email communication, I just don't' think we get each others' writing styles or something of that sort. I'm not sure what a good solution is but this is extending even longer so something has to get figured out.

(Doc. 53-8 at 531). Lingwall responded:

> Yes, tough on all of us. No one has ignored it. I have not been pushing deadlines or lab work because of it. It is taking a toll on all of us. These are difficult times for all of us. . . .

> Monday morning phone call? Microsoft Teams web meeting? 9:00?

(Doc. 53-8 at 531).

Later in the evening on April 24, 2020 (the same day that Lingwall and Hodges were exchanging emails about her EAGER proposal assignment), Lingwall sent an email touching base with Hodges on the bi-weekly update and the status of conference papers. (Doc. 55-23 at 818). Therein, he stated:

> We missed this last weeks' bi-weekly update due to the holiday, so one is due Monday morning. I'm eager to hear what you accomplished in the three weeks since the last update. We added the TRR paper revisions to what you proposed below, which we got done and submitted.

> The paper revisions for the Erosion conference need to be added to your list for the next few weeks. We have a paper due to IFCEE 2021 due in June. Abstract is attached on that. Once you send the bi-weekly update, I will add some specific details and deadlines to it to help with the expectations we've been discussing today. Then we can discuss on our call.

(Doc. 55-23 at 818). The evening of April 24, 2020, Lingwall also emailed Hodges more details on the erosion conference papers. (Doc. 53-8 at 532). He stated:

> Sent this earlier this week, but attaching the most current versions of the papers this time. Please see the attached review comments and the most current papers. I would like your proposed changes to these by May 15th. The number of hours per paper should not exceed 4. These comments are brief enough that a total of 8 hours of effort should be sufficient to resolve all comments. A response to each comment should be prepared in a separate document (example attached). We may receive additional comments. I am not sure that their system passed on all the comments.

> It looks like only reviewer #1 or 2 were passed on to us. I have sent inquiries to obtain the other comments. If we do receive their additional comments, we will have to allocate more time to this.

(Doc. 53-8). Hodges responded:

> I'm not sure why you have to put the time constraint on me. That adds a lot of extra pressure especially for a task I am just learning how to do. Please allow me to build confidence in my abilities and my work. When I read those reviewer comments it seems they want extensive revisions. These first few papers are very important for me to get it right as these articles are defining my name in the academic world. I wish I had many publications right now but that's not how the cookie crumbled.

(Doc. 53-8 at 532).

On Sunday, April 26, 2020, Lingwall reached out to two colleagues via email seeking advice on what he characterized as "personnel issue." (Doc. 55-25 at 824-25). Lingwall also reached out to human resources that weekend. (Doc. 55-2, Lingwall Dep. at 122:1-25).

On Monday morning, April 27th, Hodges emailed Lingwall stating that she would be unable to get him the bi-weekly Monday update. (Doc. 55-23 at 817). She stated:

> I'm not going to get this to you this morning. I will send it tomorrow morning. I tried to be very upfront with you in the performance evaluation. I have a different work style than you do. When I am continuously pulled in many different directions I end up not accomplishing anything. My work efficiency is nearly zero. I can try to adapt some to your style but you need to be a little patient with me as I try to do that. You can force me into working in the manner that you choose but you will have to accept that naturally I won't have the quality nor the quantity of output if I go against my inherent strengths.
>
> To do my best work I need a good solid plan. I need to properly plan and start up projects so the quality doesn't fail and so that I am not wasting time doing things in the lab and on the computer. You give me far more to do than I can possibly accomplish if I am not organized in an efficient manner for me to complete the work. It seems to me you are more of a throw it all out there and see what happens. Both of our styles have merit and value. However, our styles really vary from one another and so we are going to have to find some kind of compromise. You also need to keep in mind that you have been working on these projects for months and I am just getting started so I need some good time to ramp up and get going. I feel like you are trying to get me to skip the ramp up so I can truly understanding (sic) the projects. I can't skip that part and still properly perform my job. You are going to have to have some patience with me.

(Doc. 55-23 at 817). Lingwall replied, "Thank you for your thoughts on the matter. At this point, let's hold of on this Monday update until after our conversation on Tuesday. I have spent the

weekend doing some deep self evaluations and reviews of best management practices." (Doc. 55-23 at 817).

Hodges submitted her documents to the EAGER proposal to Lingwall on Monday, April 27 at 3:55 p.m. (Doc. 55-18 at 801). On Monday, April 27, 2020 at 4:34 p.m., in an email thread with the subject line "Thank you for the text and workload for this week," Lingwall wrote to Hodges:

> It was very helpful. We are close to having a draft! I am cutting like crazy from everyone's contributions. Too much good text!
>
> For the rest of the week, the priority is the Pond project. I need your 40-hour training done by May 1, as was the initial assignment made in February. I see that you have 23 hours left on the training to complete. I also sent another request last week to have the Pond project work plans studied and questions identified for discussion so that we can be hitting the lab hard soon. Please have this self-study finished by the end of the this week so that we can answer questions. The workplans were approved by USAF this week. More details on reasons for these specific requests to be presented in our call on Wednesday. Things will make sense once we get it explained.

(Doc. 55-22 at 814-15). Hodges responded:

> You're welcome, sorry it didn't get to you sooner. Hopefully it goes together nicely, I'm sure it will.
>
> It doesn't even tell me how many hours I have left that I could find, I'm surprised it's that many (23 hrs) I feel like I have been working on it forever. I think part of the problem is I am in the training, get distracted by an email, another task or sudden thought of something I need to check or do and then it takes a lot longer. I also did have a technical issue and have to repeat some of the training at least 30 mins to an hour I think. I've been planning that it was going to be 100% my focus after the EAGER. I'm partly so frustrated because of how this seems to be the task I can never get done because other priority things keep coming up. The training is very interesting and I am learning/reviewing a lot of great info.
>
> I haven't received anything about specific calls or internet meetings. You mentioned Tuesday and Wednesday, I didn't miss anything from you did I? Do we have another one on the pond project or is that the other meeting you meant? Not trying to pressure I just want to make sure I didn't miss anything, my outlook calendar has no upcoming scheduled meetings on it.

(Doc. 55-22 at 814). Lingwall replied:

> My fault on that, the meeting invite was still in my outbox. On its way now. Wednesday as you suggested at the time your (sic) preferred. I'm a few hours

behind the 40-hour training to you. Dr. Waterman started last week behind us both and is now ahead.

(Doc. 55-22 at 814).

On Tuesday, April 28, 2020, Lingwall had a call with Kelsey O'Neill from human resources and Scott Kenner. (Docs. 55-24 at 822; 53-7 at 513). O'Neill's and Lingwall's notes from the meeting indicated that they would be putting together a work improvement plan ("WIP"). O'Neill's typed notes from the phone call state:

> Discussion was regarding appropriate next steps for Tasha Hodges to correct lack of productivity and attitude issues. Bret mentioned that the transition from student to employee has not been smooth for Tasha. He also mentioned that she has a tendency to be very emotional and paranoid. Bret said that Tasha has a pattern of seeing fellow employees as enemies. Bret mentioned several missing assignments that he has attempted to follow-up on that she has yet to provide. Supervisor requested to implement work improvement plan to determine if FY21 contract was warranted or if a non-renewal would be best option.

(Docs. 55-24 at 822; 53-7 at 509). With regard to Hodges's COVID concerns, Lingwall's notes indicated that he was to have her contact O'Neill. (Doc. 53-7 at 513).

On April 28, 2020, at 4:04 p.m., O'Neill emailed Lingwall a draft work improvement plan for Hodges. (Doc. 59-1 at 892). O'Neill instructed Lingwall that once he has made his changes, to send it back for review so they could have a final draft before they present it to Hodges. (Doc. 59-1 at 892). At 4:52 p.m. that day, Lingwall sent Kelsey an email saying:

> Thank you Kelsey. As we discussed, I called Tasha and gave her a heads up about a new workplan model coming next week. She aired many grievances, and I understand how my limitations have influenced the situation. Tasha will be calling you tomorrow to discuss her end of things, especially with regards to Coronovirus. She also needs to ask some functional things about SNAP and vacation days that I do not have answers for.
>
> I will work on this in the meantime. I like the plan we put together in our meeting today, and I am very thankful for all your aid and assistance in this matter. I really want to make things work for the best.

(Doc. 59-1 at 892).

The parties do not dispute that phone records indicate the April 28, 2020, call between Hodges and Lingwall, wherein Lingwall gave Hodges a heads up on the work improvement plan, lasted 48 minutes. (Doc. 56, ¶ 36). Lingwall's notes from his meeting with Hodges indicate that

her "salary is burning" and "efficiency is key," that "cash is tight" and "budgets are at a premium." (Doc. 53-7 at 513). His notes state that they would be moving to an assignment-based industry management model so that expectations are clear. (Doc. 53-7 at 513). The notes state that the "management of industry researchers" model that he uses for everyone else is not working, that he has let "Hodges have freedom and the results have been poor" and that allowing Hodges to work on what she wants isn't working. (Doc. 53-7 at 512). Lingwall's notes indicate that it is the expectation that Hodges will report the number of hours each week that she works on each project, and her work product completed, and that all work assigned via email or in meetings will be completed by their due dates within the allotted number of hours as specified. (Doc. 53-7 at 512). Lingwall's notes state that Hodges was to talk to O'Neill, that they needed third-party help, and Hodges was not to send anymore "volatile or inflammatory emails" to Lingwall or others. (Doc. 53-7 at 512). Lingwall indicated in his notes "no more being overwhelmed," and "40 hours of productivity for 40 [hours paid]." Lingwall indicated in his notes from the meeting that he and Hodges would be doing this "industry style management model" for 6-weeks and then re-evaluate on June 9th." (Doc. 53-7 at 512).

Lingwall's notes from the meeting state that "Tasha became alternatively violent and tearful in her words and tone," and that "Tasha protested and proceeded to call me names, accuse me of lies and bullying and said awful things about me." (Doc. 53-7 at 512). During Lingwall's deposition, he testified that he recalled that this conversation had occurred on April 24, 2020 and that this has prompted him to initially reach out to Human Resources over the weekend, but Lingwall's phone records indicate that no such conversation occurred until Tuesday, April 28th. (Docs. 55-2, Lingwall Dep. 122:22-124:25; 55-4).

O'Neill had a phone conversation with Hodges the next day on Wednesday, April 29, 2020. (Doc. 55-24 at 822). O'Neill's typed notes from the conversation state:

> Tasha contacted me after being referred to me by her supervisor. The supervisor told me on the call the day prior that Tasha had some COVID-19 concerns and he thought I would be the best person to discuss those with her. The phone call was very emotional from the very beginning. She was using a nearly yelling voice and began discussing issues she had with her supervisor. Tasha pointed to lack of priorities from her supervisor as an overarching problem in their communication. Tasha mentioned that she doesn't feel that any decline in productivity is allowed by her supervisor. Tasha also said that she has to work all the time, including weekends and her anniversary.

(Docs. 55-24 at 822; 53-7 at 510-11).

On May 3, 2020 at 6:09 p.m., Lingwall emailed O'Neill with his edits to the work improvement plan. (Doc. 55-13). Therein, he stated:

> Since we are already doing a non-renewal of the contract, I removed much of what I had proposed in the WIP, so that things are less severe in tone. We also had to modify the schedule based on some lab equipment failing on Friday that is shifting some work priorities. The attached is my proposed update, the (sic) is much streamlined and has an updated schedule. I am much more comfortable with this "softer" and gentler document that will get us through the 5th of June so that we can issue the non-renewal and put her on admin leave the last week of the pay period.

(Doc. 55-13 at 778). When questioned during his deposition as to his goal with the work improvement plan, Lingwall testified that "when it was initiated, it was an earnest attempt to right the ship, to try to improve that work. We truly wanted for her to kind of make those corrections, to kind of – for us all to have a cooling off period and to get things moving in the right direction." (Doc. 55-2, Lingwall Dep. 165:22-166:2). Lingwall also testified, however, that at the time they issued Hodges her work improvement plan, he had already made the decision not to renew her contract. (Doc. 55-2, Lingwall Dep. 165:6-21).

On May 4, 2020, O'Neill, Kenner, and Lingwall had a phone call with Hodges to introduce the work improvement plan. (Doc. 55-24 at 822). O'Neill testified, and her notes from the meeting reflect, that Hodges interrupted immediately and would not let anyone else speak. (Docs. 55-24 at 822; 55-8, O'Neill Dep. 56:18-57:6). Following that meeting, Hodges sent an email to Lingwall, O'Neill, and Kenner asking "Please do address why this document says how much I have not met expectations when the performance evaluation document we just did says I have met and/or exceed all expectations." (Doc. 53-8 at 545). Lingwall responded on May 4, 2020 at 2:56 p.m., saying:

> Hi Tasha,
>
> The annual review that you reference was based on your work of 9-months as a student finishing up the degree, and 3 months of part time work where a transition to the research scientist role was allowed. We had good productivity for the 20-hours per week being paid to that point within the expectations of the part-time work and transitioning to someone working under a scope-schedule paradigm rather than the student paradigm. That review date was March 11th. These concerns are more recent and reflect the specific time period of March 22 to April 21.
>
> In the month period of March 22 to April 21, for the Pond project, two tasks were assigned for that project. These tasks were 1) 40 hour HAZWOPER training, and

2) self-study of the workplans. On March 24 you committed to having the HAZWOPER 40 hours done by April 7th. Within the month referenced, 72 hours were billed to that project for your paycheck. In the 72 hours billed, the 40-hour HAZWOPER training had not been completed, nor had the assigned self-study of the workplans been completed. By the accounting of the HAZWOPER system, in that period whether 72 hours were billed, ~23 hours out of 40 hours of the training were complete. So, I have 72 hours billed and only 23 hours of work demonstrated. That period of time (March 22 to April 21) is within the full-time window less the admin leave for the Easter Break. Hence 72 hours rather than 80 hours for the project in the time period. As a supervisor, I have to ask if we have gotten good value from those 72 hours billed and paid.

The other 72 hours billed in the same pay period were to the Termite Project. Within the scope of that project and the allotted 72 hours, we set aside time for you to do paper edits, 3D models, and other tasks such as selection of a preferred modeling software all on the terms that you proposed in your bi-weekly workplans. On this second set of 72 hours, the modeling software selection task has had no progress, nor have you provided me with any updates on that task. From those second 72 hours billed I have the following products from you: edits and revisions of a 7,000 word paper (by your own admission 16 hours of work), 1000 words for a proposal, and 1 3D printed model (Done March 30th) of demonstrated production. As a project manager, I have to ask if we've gotten good value for those 72 hours. All managers have to look at the value that is being received from their people for the amount of time spent. I would not be doing my job if I was not looking at the production compared to labor investment. With money tight across campus, we need to maximize their return on investment value of our time.

The provided workplan is designed so that we can demonstrate good value for the amount of time worked. We need to see good and efficient return on our investment into you. We have, and continue to invest in you. This workplan is designed so that we can demonstrate good value for the amount of time worked. This workplan removes miscommunication and uncertain expectations/priorities from clouding the work of the next pay period. With specific metrics on all points we will be better able to judge the return on investment from you as a full-time employee.

I hope that this clarifies the specifics of my concerns about productivity. I am not looking for a detailed response to this, with a litany of reasons why different tasks were or were not completed. Nor are we looking for an argument on if you were working or not. I am not going to respond to a reply of that nature. As the employer, I need improvement over the next pay period. We know that you were working March 22 to April 21, the questions are coming down to value for the hours spent. With the workplan model provided by Kelsey, we are focused on the future, not the past. Indeed I hesitated to even list the past in response since we want to be forward looking. However, you deserve to know, so I have listed it here. From this point on though, we are focusing on the future.

(Doc. 53-8 at 540-41). Before viewing Lingwall's response, Hodges sent an almost 4-page email to Lingwall, O'Neill, Kenner, and blind copying Professor Lisa Kunza. (Doc. 53-8 at 542-45).

Therein, Hodges expressed appreciation for O'Neill's suggestions during the workplan phone call to improve her communication with Lingwall. She further stated, in part:

> My understanding from our conversation was that to help me I needed to learn how to say to Bret "How can I help myself bring this back to what I need from you?" Also you talked that it was fair of Bret to come to me with tasks and ask me how long I thought they would take me to do as I should be allowed to have some say in this. I feel like this work plan document has done the complete opposite of everything that was occurring and just promoted that Bret's accusations and analysis of the situation were accurate. . . . It feels like when I try to address concerns for misunderstandings to Bret it turns more into him explaining how it is not his fault that I misunderstand, he claims I said things and agreed to things I never did, he often makes me feel stupid for even asking for help and is instead my problem to be better. I think a good manager would say, "hey we got off track here due to miscommunication. How could you have understood better? What part of this did you not understand? How could I have communicated better?
>
> . . .
>
> My point in outlining this to you is that just because Bret says I failed and have reduced productivity it does not mean it is true. He is unfairly accusing me and I can give you details of recent events as well of my productivity achievements if you would like.

(Doc. 53-8 at 542-45). Later that evening, in response to Lingwall's email clarifying his concerns about her productivity, Hodges responded to Lingwall, O'Neill and Kenner, saying, in part:

> I truly believe this situation has escalated to the level it has due to the increased difficulty in communication due to coronavirus complications. Due to dealing with this situation my productivity has gone down and likely will continue to be down unless there is resolution. When this big of an issue occurs there has to be resolution we don't just get to move forward and pretend the past didn't happen as I feel your email was trying to say was what was going to happen. I don't think it is fair to make false accusations about an employee, tell other people first so they have preconceived notions about me, get me all upset in a phone call right before I am going to talk to HR and tell me to be silent by saying you don't want to hear it.
>
> I am putting some text from my original write up email to address your comments on the termite project and modeling which explains one of the many things that you didn't give me credit for:
>
> "I did a bunch of research on computer capabilities, modeling software requirements and required capabilities to accommodate the modeling software for the project. I then bought my own computer instead of waiting for the time when we could purchase one on the project budget as you told me it would be a long time before you could get me one. Had I not done that we wouldn't even be in a position to be discussing modeling right now because I wouldn't have the capabilities to do

such on my old computer and you weren't able to provide me with a capable computer at this time. Had I not purchased this computer it would be months at the earliest that I could start modeling so why are you saying I didn't meet this goal when I am doing everything I can to get ahead of the goal?"

(Doc. 53-8 at 539-40). Hodges and Lingwall also exchanged emails regarding amendments requested by Hodges to the work plan. (Doc. 55-24 at 822; 53-8 at 539). On May 5, 2020, at 9:54 a.m., Hodges sent an email to Lingwall, O'Neill, Kenner, James Stone, Dr. Lisa Kunza, and Dr. Andrea Surovek saying that:

> I am still very concerned about this document being on my record as I feel it is very misleading and incomplete. . . . The document does not address (1) what tasks or productions I failed to accomplish, (2) what counseling was provided to me, (3) evidence that these tasks were assigned to me with deadlines and many other crucial points. I will not sign a document I find very misleading, contains lies and is incomplete that makes me look very bad and that will be on my record forever. The alleged "counseling" on April 28th was the first I had heard about your "productivity" concerns with me and this was after you had already gone to HR and various other people before you addressed said concerns with me. . . .
>
> It seems to me like the time allocations in the work plan document you provided do not properly fit the projects that are paying my salary. It seems that I should and I would like to be spending nearly 20 hours on each of the two jobs that pay my salary? A few hours (whether within my 40 hour work week or additional time now that I am salaried) on other projects seems acceptable but not the majority of my time. You claim I had lack of productivity (within sufficient evidence or examples) on the two projects that have deadlines but I would say, if true, that this is in large part due to the push to work on other things outside of my regular job functions and make these other tasks priority over my regular job functions. If true this was not due to failure on my part or your "flexible" management style as is claimed in the work plan document. You were very clear to me that these other tasks took priority and I would also very much disagree that your management style has been flexible and think it more resembles that of a micro-management/overwhelming/highly involved management style yet with poor productive communication.
>
> I cannot stay up to speed on the termite project and AF project if I am spending so much time on other research that is doing nothing more than advancing mine and your personal careers by increasing publications and personal interests. I finished my dissertation and we finished ALL contractual requirements for that project. In the past I have addressed concerns to you about working so much on other projects that are not paying me. I asked if this was an ethical practice and you said that this was completely accessible on these types of projects. However, it has become apparent that the focus needs to shift from these other duties you are assigning me over to work on my assigned projects with additional time only to be allocated to other tasks such as BiCaN and proposals as is available or allowable without taking away from my contractual projects. I feel once I am up and going on these projects

and they are in good position this will allow me much more flexibility and confidence to work on other projects for my career and to publish more articles from my dissertation work. I do not feel I was given a chance to prove myself on these projects (as I was salaried for less than one month when you started making these claims about me).

You have been giving me so many other tasks to work on that don't pertain to the project I am contractually obligated to work on and I think this issue needs to be addressed prior to my signature on this work plan document. I have list upon list of the assigned tasks if there is any confusion about this occurring. I also think part of the reason you think my productivity is failed is we have always had the best communication in person during which I would update you on everything. We have not been able to do that due the COVID-19 shut down and it seems you have been too busy to read my emails or ask me about productivity and therefore it must feel to you that my productivity is down but I can assure you I am doing the best I can and if there was lack in productivity due to my internet going down, miscommunications, working on other tasks outside of my contractual project and all of these disagreements I will be making up for it and then some over the next couple weeks because there is nothing I aim for more than to succeed in my work functions and excel in the research I am completing. You know that I have worked for you for 5 years. Also I sent you a Monday update on the 1st Monday of April with many items addressed that I think represents direct opposition to your claims about me. I did miss the third Monday update as I forgot due to Easter break confusion, producing corrections on the TRR paper along with redoing graphs and extensive editing requirements requested by the reviewers and EAGER proposal confusion and then completion. I am very sorry for that and that is why I am transitioning to every Monday updates so I don't have to keep track or get confused when there is not a Monday. . . .

(Doc. 53-8 at 536-38). Lingwall responded to Drs. Kunza and Surovek, stating "Please disregard the email below and delete. It is confidential between Human Resources and parties directly involved with supervision." (Doc. 53-8 at 536).

On Wednesday, May 6, 2020 at 8:15 a.m., Hodges emailed Lingwall, O'Neill and Kenner, stating "This is my official notice, as requested in the document, that I do have concerns about the time constraints on the tasks." (Doc. 53-8 at 547). Lingwall responded that:

We all understand the time constraints concerns, but we have many time constraints that the entire team and university are working under and we need to find efficient ways of working. We all wish we had more time to work on everything we want. Besides, the review and writing assignments are not intended for perfection, as I will be working on them after you are done with them and taking those under my daily workload where I in-turn will feel the time crunch and wish I had more time.

(Doc. 53-8 at 547). Later that afternoon, on May 6, 2020, Hodges emailed Lingwall, O'Neill, Kenner, and James Stone, stating:

> To whom it may concern,
>
> This is a high priority email in response to the email sent by Dr. Lingwall on 5/4/2020 at 2:56 PM.
>
> In regards to the pond project, I did finish the second item listed (self-study of work plans) and in fact asked questions about the work plans during the Zoom project meeting on 4/9/2020 at 3:00pm. I finished more than half of the HAZWOPER training but was asked by Dr. Lingwall to focus on some other items. Here is a direct quote from Dr. Lingwall's email sent to me on 4-7-2020 at 8:33 AM: "Thanks for the update email. Looks like you are using your time well. The pressing tasks aside from the 40-hour training are 1) updates and revisiosn to the TRB paper (Due next week); 2) The carbon sequestration EAGER proposal."
>
> In regard to the termite project (3rd paragraph) I have made progress including researching software requirements and purchasing a computer at my own expense that will complete the modeling software requirements. I did send updates in an email title "1st Monday Update for April" sent from myself, Dr. Hodges to Dr. Lingwall on Manday 4/6/2020 at 10:40 AM.
>
> The termite model was printed on my 3D printer at home along with experiment trays that were designed on software I purchased to help accelerate the time in which all these tasks can get completed. This is a nice option when working remotely during COVID-19 as I am still able to be productive and complete tasks that normally would require on-campus labs, software and computers.

(Doc. 53-8 at 535). Lingwall responded directly to O'Neill regarding this email from Hodges on the morning of May 7, 2020, saying:

> Hi Kelsey, it does not look like she is getting the message about not sending these emails. Please advise. Thank you.
>
> The stress caused by her unwillingness to be professional in this matter has taken a great toll on me the last two weeks. Last night was the 10th with less than 4 hours sleep since this all began. Productivity on my end has plummeted doe (sic) to the emotional exhaustion. I had hoped that the cooling off period would have helped with the stress, but her frequent inflammatory emails have rekindled the worst of it again. Instead of working on assigned tasks, she has spent many hours on these emails, which appears to be a violation of both the WIP and the code of conduct. Can you please ask her again to cease and desist with these emails? If they keep coming, I may break.
>
> Thank you for all your help and support with this difficult situation.

(Doc. 55-15 at 786).

On Thursday, May 7, 2020, Hodges emailed O'Neill and Nancy Feiler requesting a meeting and stating that she needs "to file a formal harassment and bullying complaint against my supervisor Bret Lingwall." (Doc. 53-8 at 546). O'Neill emailed Hodges a harassment/ discrimination complaint and said that once she received the completed form, "we will determine who will investigate and will begin with the investigation" and told her that "if she would like to schedule a time to discuss questions you have on the process," to "please let [her know]." (Doc. 53-8 at 546). Hodges never filed a formal harassment complaint while she was employed by the School of Mines.

On May 11, 2020, O'Neill had a phone call with Hodges and Human Resources Assistant, Sherry Schell. (Doc. 55-24 at 822). O'Neill's notes from the meeting indicate that Hodges talked about her frustrations with the work improvement plan and that she felt Lingwall was abusing his power over her by issuing the work improvement plan. (Doc. 55-24 at 822). O'Neill recorded that Hodges requested that the Friday, May 22, 2020, meeting be postponed as Hodges did not feel comfortable meeting with Lingwall to discuss her status on the items she was assigned. (Doc. 55-24 at 822). Also on May 11, 2020, and on May 15, 2020, O'Neill spoke with Kenner and Lingwall about the current status of issues between Hodges and Lingwall. (Docs. 55-24 at 822; 55-11 at 766-67). O'Neill's notes from the phone call indicated that Lingwall stated that Hodges's work was acceptable until COVID-19 hit in March 2020. (Doc. 55-11 at 766). O'Neill's notes indicated that Lingwall said that Hodges's "performance is ok, treatment is not ok." (Doc. 55-11 at 766). The parties determined that based on the way things were going, the best option was to rescind the work improvement plan and have Kenner mediate between the two for the time being. (Doc. 55-24 at 822; 55-11 at 766-67). O'Neill testified that they had concluded the work improvement plan was a poor tool under the circumstances because of the "lack of ability for the supervisor and employee to properly communicate through that work improvement plan and for both parties to have clear expectations because the line of communication was so broken by the time we got to this." (Doc. 53-6, O'Neill Dep. 81:12-82:1).

The Pond Project had not started yet because the lab materials were delayed, and O'Neill's notes from the May 15, 2020, meeting indicated that Lingwall said they were not going to pay Hodges to do nothing. (Doc. 55-11 at 767). O'Neill recorded Kenner stating that they want Hodges's time remaining to be as productive as possible. (Doc. 55-11 at 766). O'Neill's notes

indicate that Hodges would be assigned tasks from the work plan and that they would ask her if she had enough to do. (Doc. 55-11 at 767). O'Neill recorded Lingwall expressing concern about whether Hodges's rate of productivity was okay. (Doc. 55-11 at 767). It is also noted that Lingwall said that "unless she apologizes, no contract renewal" and Kenner responded that he was "not going to refute that." (Doc. 55-11 at 767). On May 15, 2020, O'Neill sent Hodges an email formally rescinding the work improvement plan. (Docs. 55-24 at 822; 53-6, O'Neill Dep. 79:12-82:1).

Serving as the intermediary between Hodges and Lingwall, Kenner forwarded an email from Lingwall to Hodges on May 16, 2020 at 4:50 p.m. which stated:

> Hi Tasha, In our discussions it is clear that you want more clarity on if certain tasks align with project activities. The revised task assignments below reflect the current priorities and show if the task is directly related to a project or not. You will see that there are several tasks not directly related to the projects. This is because 1) they still need to be done as part of our work at the University, and 2) since the geomembranes for the Pond project have not arrived yet, nor will they for a couple weeks (most likely based on current shipping estimate), we have to assign tasks not directly related to the project to keep you busy. We put a deliverable on as many tasks as possible to ensure that accountability is present. On a second note, paper writing is part of our business! The estimates of how much time a task will take are still included, but we are not asking for a timecard update of how long things actually take; these are simply our estimates to help you schedule your time and be cognizant of what rates of work peers are producing. The tasks shown in the table should get you through June 22nd, with plenty to keep you busy with. There are quite a few lab assignments, but most of it is writing so that social distancing can be optimized. Because the geomembrane delivery is uncertain, you'll have to be nimble; when the membranes arrive, jump on those ASAP please.
>
> We've also added clarity as to what needs to be archived. Attached is a portion with the US government that details what needs to be archived.....essentially everything that you did in your research from Sept 2016 through Feb 2020, which is the period of the contract. The contract technically is closing this month. We can either archive your lab notebooks as hard copies or scans, but either way, the contract and project data management protocols are clear that it all must be archived. Any spreadsheets used to create any plots. Anything that was produced but not in the dissertations or report or publications to date. All of it must be archived.

(Doc. 53-8 at 548). Hodges responded to Kenner, stating, in part, that "I know in my discussions with Bret he is acting like we are really far behind on projects but that simply isn't true. Everything is moving along as well as it can with COVID-19 which has set back some tasks which are beyond

our control. I believe he is putting that pressure on all of us so we don't go looking into why he is doing what he is doing." (Doc. 53-8 at 548).

On Friday, May 22, 2020, Hodges sent a 4-page email to Kenner and O'Neill regarding the task priority response she received from Lingwall via Kenner on May 16, 2020 at 4:50 p.m. (Doc. 53-8 at 550). With regard to priority 1, "edits to erosion conference papers," Hodges stated that she is "investigating some unusual circumstances and facts surrounding this request. As I wait I have worked some on editing these papers." (Doc. 53-8 at 550). With regard to priority 2, "uploading all documentation of all testing for PhD research to OneDrive," Hodges stated that she "has fulfilled all of [her] duties as a PhD student as [her] graduate checkout sheet verifies," that "the referenced contract ended a while ago" and that she is "almost positive [Lingwall] sent all the deliverables laid out in the contract (not laid out in the portion he attached) as I always supplied him with all the needed information as he was writing them and he would tell me he submitted them." (Doc. 53-8 at 550). Hodges stated that the School of Mines "has a responsibility to protect me as a PhD graduate from their institution from [her] former PhD advisor falsifying information about me then using brut (sic) intimidation and fear in an attempt to make me give him all of my research plans and goals for the future." (Doc. 53-8 at 551). With regard to priority 3, "IFCEE Paper – GeoCongress paper as a template," Hodges stated that she is in the process of writing this paper and that going forward, she would like to be a corresponding author on future papers on which she completes most of the work. (Doc. 53-8 at 551). With regard to priority 4, "3D models of 4 additional mounds ready for printing," Hodges stated that she will no longer use her personal computer for this project, and requested that the School of Mines provide her with a computer to carry out these functions. (Doc. 53-8 at 552). With regard to priority 5, "set up the new fridge and repair the old if possible," Hodges stated that she can set up the new refrigerator, but that they should consider having the old one repaired as it was under warranty. (Doc. 53-8 at 552). Hodges stated further that she was "afraid of running into Bret Lingwall at the school particularly during a time when few individuals are present on campus and would like assurance that [she] will not have to meet up accidentally with him when [she goes] into the lab." (Doc. 53-8 at 552). Hodges stated that "Bret Lingwall's extreme harassment, power control and bullying, particularly since April 28th, 2020, have struck me with fear of meeting up with him and I do not want to have to be near him without someone in a higher position present." (Doc. 53-8 at 552). With regard to priority 6, "remove all materials, supplies, samples, or other items from CM 110," Hodges replied

that she didn't have anything in CM 110, except for a bottle of HCI in the acid cabinet which should remain with the acid cabinet and that she also has "samples in the cryo-freezer that should be find staying there." (Doc. 53-8 at 552). With regard to priority 7, "triage the specimens in the fridge that failed, and check on the vitality of the cultures," Hodges replied that "this is unnecessary and not project related [and] that it is advised that new bacteria be used for any upcoming experiments." (Doc. 53-8 at 552). Hodges also advised that an investigation into the refrigerator malfunction be conducted, that she did "not believe sabotage can be ruled out." (Doc. 53-8 at 552). With regard to priority 8, "receive membranes when they arrive, cut to 12-[inch] squares," Hodges said that she will do this when the materials arrive provided that the situation with Lingwall is resolved since she does not feel comfortable or safe being in close proximity to him without someone in higher management position present. (Doc. 53-8 at 552). With regard to priority 9, "provide a step-by-step breakdown of creating the 3D meshes for 3D printing," Hodges replied that she will need the School of Mines to provide a computer capable of modeling to carry out this task. (Doc. 53-8 at 552). With regard to priority 10, "draft manuscript for paper on best practices in microbial geotechnics," Hodges replied that "[t]his appears to be an attempt to force [her] to give Bret Lingwall my plans for future research proposals. Also, to complete a meta-review of literature and supply all the information requested in a mere 24 hours is ridiculous." (Doc. 53-8 at 552). With regard to priority 11, "workplan for the calcimeter experiments," Hodges replied that she did not believe it was project-related, that as far as she knew, Lingwall "didn't want to do calcimeter tests on termite samples" and if he "changed his mind about this then he needs to tell me that." (Doc. 53-8 at 553). With regard to priority 12, "draft manuscript for paper on the economics and environmental impacts of bioaugmentation biomineralization paper), Hodges stated:

> I believe it is time that other parties such as: Dean Maribeth Price, the SDSMT business office, SDSMT research office and potentially even attorneys be involved on how best proceed with publications from my dissertation and future research plans for my own personal research program. I will not be bullied and power harassed by Bret Lingwall any longer and since he is my supervisor who is grossly abusing his power over me it is apparent others need to be involved in how to proceed forward with research publications.

(Doc. 53-8 at 553). With regard to the final priority 13, "workplan for the water erosion and vegetation experiments remaining in the BioCaN program," Hodges referred Kenner and O'Neill to her response to priority 12. Hodges ended her email as follows:

33

I have thoroughly reviewed the information, situation, emails, etc. from the last few weeks and months. I do believe that Breg Lingwall's actions against me have been malicious in intent. I would like to know how SDSMT is protecting me from Bret Lingwall and his extreme behaviors against me. Falsifying information with intent to harm an individual's reputation or career and falsifying a document in an attempt to forcibly gain information from an individual are serious acts to commit against another person. The evidence will likely show that these are acts that Bret Lingwall has committed against me.

(Doc. 53-8 at 553).

At some point, although it is unclear when, the Termite Project team received a one-year no-cost extension from the National Science Foundation (from August 2021 to August 2022) due to the COVID-19 pandemic. (Doc. 53-3 at 484-85). This meant that the National Science Foundation would allow additional year to complete the project, but funds expended during the pandemic to support students and faculty in which time laboratories and other facilities were closed was not compensated for in the COVID-19 extension. (Doc. 53-3 at 484). Thus, the project needed to have an additional one-year of support, but stretch the remaining funding amount for that time period. (Doc. 53-3 at 484). Sometime in May 2020, prior to the investigation into Hodges's harassment claim, Dr. Lingwall provided a budget analysis to Kenner and O'Neill as part of discussions related to the work improvement plan and potential non-renewal of Hodges's contract. (Doc. 53-3 at 485). Lingwall's analysis showed that if School of Mines renewed Hodges's contract, they would need an additional $40,000 to complete the project. (Doc. 53-3 at 485; 52, ¶ 51; 56, ¶ 51).

In response to Hodges's May 22, 2020, email to Kenner and O'Neill accusing Lingwall of extreme harassment, power control and bullying, O'Neill notified Hodges via email on May 29, 2020, that "they have determined that an investigation into potential allegations of harassment by Dr. Lingwall is necessary." (Doc. 53-8 at 554). A "no contact" directive between Lingwall and Hodges was put in place and Hodges was permitted to continue working remotely. (Docs. 52, ¶ 62; 56, ¶ 62).

On June 2, 2020 at 8:35 a.m., Kenner, as intermediary between Hodges and Lingwall, relayed that Lingwall was inquiring whether Hodges was still planning to complete edits and writing on the following papers:

- Two draft paper revisions from peer review are due to the publisher on June 15th. Bret would like them if at all possible by June 5th so he can review before submittal. Please know that if you are not planning to complete those he will proceed with the required edits.
- Together you have a draft paper for a conference due July 17th. The abstract was accepted back in February. He is hoping a draft would be completed by June 15 again to provide some time for him to review. My understanding is that the deadline for this got moved to July due to the COVID situation.

(Doc. 53-8 at 560-61). In response, Hodges stated, in part:

1. I am working on these edits. Bret changed some data and labeling that I do not agree with and I am trying to figure out why and if I need to change it back. . . . At this point I would really prefer with all the controversy and confusion with these two papers that they are pulled from the conference. Also, ASCE makes clear that corresponding authors are supposed to get approval from all authors prior to submitting. He isn't doing this for me on papers, including these two, and I am not happy about it. . . . I am the first author that did all the work in regards to experiments, data analysis and some of the writing (much coming from my dissertation). I am quite upset that Bret took it upon himself to keep submitting abstracts to conferences instead of journals. . . . Journals are better about making sure all authors approve whereas conferences are not good at that and leave it in the hands of the corresponding author. . . . Now large portions of my dissertation data will be useless to submit to journals because he has submitted so much of it to conference proceedings. . . .

2. I am working on this paper. However, I do not want it submitted unless I am the corresponding author on it. Bret needs to inform the IFCEE conference and technical committee that I am now going to be corresponding author on this paper and get the abstract submission transferred over to my control. He will be second author and I will send it to him for approval prior to my submission, I will make his requested changes or tell him why I will not be making his requested changes and send it again to him for final approval. . . . This is how the corresponding author is supposed to do paper submissions, he does not do this for me. . . .

3. In addition I am working on some other papers I want to write, proposal ideas and business ideas. Over the next couple months I will be using resources I have available to me at SDSMT and in the local community to help me in these ventures. . . .

4. I am still upset that I gave ideas and writeups about the EAGER proposal and then immediately thereafter was removed from the project even though some of my contributions were included in the submitted proposal. . . .


Termite Project

- I printed two more termite mounds. . . .

35

. . .

- Would you like me to proceed forward with loading modeling software on my own computer including rhino and griddle? I (sic) seems I can do a free trial of rhino. I tried to load this trial and had issues. Bret had said that the project had 3 licenses of Rhino. Should this go on my own computer or will the school be providing me with a computer to load the software onto? I can try again with the free trial but if I am not able to get it working I will need information to school owned license and/or a computer to do it on. I will also in the meantime look into any other software that may be of use. I do not know if the free trial of Rhino has full capabilities yet so I can dig into this. I looked into tutorials on the software but wonder if these tutorials came with the license we purchased. I would assume they did.

(Doc. 53-8 at 556). With regard to the Pond Project, Hodges stated in her June 2, 2020, email that:

> I do think there may be some value for the project/school in putting me back to part-time status in which I am only working 20 hours a week until the situation between Bret and I is resolved and until I can work nearly full-time in the labs. This may also benefit me as I won't be feeling as pressured since this situation has taken more of my time than I would like. I am concerned because at this point in time I am not able to contribute 20 hours a week or anywhere close to that time to this project due to COVID. The only tasks I have been able to do for this project since I started on it are the hazwopper training (which was a lot of time), document review and a 1 hour meeting. This is because most of my responsibilities on this project are lab work and due to COVID-19 the lab work has been delayed due to laboratory setup and materials ordering and delivery.

(Doc. 53-8 at 559).

On June 4, 2020 at 4:19 p.m., Kenner replied to Hodges' email, stating that "in discussion with your supervisor and HR we agree that going back to half time would be beneficial. Starting June 8, 2020 your position will be 20 hours per week through the current contract period. Your research work effort should be focused completely on the termite project." (Doc. 53-8 at 562). With regard to Hodges's work assignments on the Termite Project, Kenner relayed, in part, that: 1) she deliver the termite mound prints to Dr. Kenner no later than June 10th; 2) that 3D point cloud models Hodges processed be uploaded to the Dropbox so Bret can review the models no later than June 10th; 3) no additional termite model prints are needed; 4) computer modeling is not a priority at this time; 4) she develop a workplan for calcimeter experiments and implement experiments. (Doc. 53-8 at 562).

36

In her reply, Hodges stated that she had been advised by various people to seek legal representation. Hodges stated that Lingwall's responses to her update to work emails don't make sense. (Doc. 53-8 at 564). Hodges stated, "Please start working with me on this situation and start providing me with answers as to how this situation is being dealt with. Quit letting him dominate the situation. Start making him explain his actions towards me." (Doc. 53-8 at 564). Hodges said that she has been to the doctor and was experiencing very traumatic symptoms. (Doc. 53-8 at 564). Hodges questioned whether going back to half time was the best thing. (Doc. 53-8 at 565). She clarified that when she suggested going half-time, she just meant to delay being paid on the project due to the fact that, because of COVID, essential materials had not been delivered and lab work was thus delayed. (Doc. 53-8 at 565). Hodges questioned whether she was permanently losing the Pond Project and stated, "Of course Bret is all for kicking me off that project. So am I being punished for my supervisor severely mistreating me?" (Doc. 53-8 at 565). Hodges stated that her work was becoming more difficult because she can't get straight answers on what work she is supposed to be doing. (Doc. 53-8 at 564). Hodges stated that:

> There has been a lot of confusion and misunderstanding. Bret is leading this confusion by continuously changing his story and not making sense and yet it keeps being allowed. Is anyone making him explain his actions towards me? This thing of only communicating with a moderator is working in his favor because it allows further poor communication and he is further confusing everyone as he puts out a smoke screen.

(Doc. 53-8 at 564). Hodges referred Kenner and O'Neill to a Tedx talk called "Bullying and Corporate Psychopaths by Clive Buddy." (Doc. 53-8 at 564). Hodges also expressed concern with "dishonesty [she] has seen Bret Lingwall putting into [her] research [papers]," that she has "zero tolerance for lack of integrity in research and therefore this pressure to publish needs to be released from [her] so that [she] can properly address these concerns." (Doc. 53-8 at 564).

With regard to her assignments, she questioned in the email: 1) how can she be required to turn in printed materials that Lingwall previously said no to; 2) why are the 3 point cloud models critically important when Lingwall said that computer modeling is not a priority, and she needs a proper computer and software for modeling; 3) what project the calcimeter testing was for and whether he wanted this done on the termite samples. (Doc. 53-8 at 566). With regard to Lingwall's comment on the computer modeling not being a priority, Hodges said that:

> This is the only thing I can do on the termite project remotely! If I am being removed from the AF project to only the termite project what am I supposed to be working on for this project if not for modeling? There is XRD and SEM to work on but that needs to be scheduled through the school. There are also papers I could start on but those aren't priority? If the termite project has a critical path wouldn't these papers be priority over the other ones Bret has assigned me? Please be aware none of the writing assignments were related to this project, why not? This is a question Bret needs to be asked.

(Doc. 53-8 at 566).

On June 10, 2020, Professor Lisa Kunza sent an email to O'Neill and copying Dr. Ralph Davis, Vice President of Research as School of Mines, asking how she could stop paying Hodges for the Pond Project:

> I am the PI on the Ellsworth Pond 3 project that is employing Tasha Hodges for 50% effort. In all of the time that she has been on this project via her supervisor Bret Lingwall, she has delivered 40hr-Hazwoper training and possibly read some of our workplans. As I go to certify effort reports, etc., I'm not sure what you would like me to do. She is not delivering 20hrs/wk of work on the project. Am I supposed to note in my review of those hours in some way that it didn't happen? Due to the previous e-mails I was tagged on by Tasha, I know that HR is involved in her situation. What steps do I need to take to stop paying Tasha for my project?

(Doc. 53-7 at 498).

By letter dated June 19, 2020, from Dr. Ralph Davis, Vice President of Research at School of Mines, Hodges was informed that her contract as a Research Scientist II with the School of Mines would not be renewed for fiscal year 2021 due to budgetary deficiencies and that her employment would end on June 21, 2020. (Docs. 53-7; 52, ¶ 67; 56, ¶ 67). Lingwall testified that also that Hodges had not made any progress on writing proposals to try to get more money to fund her position. (Doc. 55-2, Lingwall Dep. 163:6-14).

## II.    Title IX-EO Investigation Report and Charge of Discrimination

On July 16, 2020, the Title IX-EO Investigation Case Report was issued. (Docs. 52, ¶ 68; 56, ¶ 68). Their ultimate determination was that there was "not a reasonable basis to establish that [Hodges] was subjected to discriminating behavior." (Docs. 52, ¶ 68; 56, ¶ 68). Further, the investigators "could not conclude that the allegation met the reasonable person standard or fully satisfied the criteria for 'Hostile Environment-Harassment.'" (Doc. 52, ¶ 68; 56, ¶ 68).

Hodges submitted a Charge of Discrimination with the EEOC and received her Notice of Right to Sue on January 25, 2022. (Doc. 52, ¶ 69; 56, ¶ 69). In her Charge of Discrimination, Hodges alleged that the earliest date the discrimination took place was January 7, 2020. (Docs. 52, ¶ 70; 56, ¶ 70). Hodges testified that January 7, 2020 was chosen as the date by the EEOC intake person because Hodges was told it would better if the dates encompassed a shorter timeframe. (Doc. 56, ¶ 70).

### III.    Federal Lawsuit and Allegations of Discrimination

On January 28, 2022, Hodges filed this lawsuit against South Dakota School of Mines and Technology. (Doc. 1). On November 17, 2022, Hodges filed her First Amended Complaint against the South Dakota Board of Regents alleging the following: 1) Title VII sex discrimination claim; 2) Title IX sex discrimination claim; 3) Title VII retaliation claim; 4) Fair Labor Standards Act claim; 5) retaliation and reprisal claim for complaint about wages in violation of South Dakota public policy, including SDCL 60-11-17.1. Hodges states in her brief and at oral argument that she is no longer pursuing her FLSA claim. Hodges argues that Lingwall discriminated against her on the basis of her sex. She argues that throughout her 5 year-tenure working under the supervision of Lingwall, first as a student, and then as a Research Scientist II, Lingwall spoke about women in a derogatory manner. Hodges argues that she was issued a work improvement plan and her contract was not renewed only after she demanded to be treated with more respect after earning her PhD and after asking to be paid for the work she was performing. Here are the purported discriminatory comments and actions that Hodges reports Lingwall to have made:

### A. 2016 Rape comment

Hodges testified that in 2016, she and Lingwall were talking about fraternities and Lingwall out of the blue says, "You know, I can tell when my female students were raped over the weekend." (Doc. 55-1, Hodges Dep. 79:9-13; 56, PSOMF, ¶ 26 ; 58, ¶ 26). Hodges testified that she was taken aback by this and asked him "how he could possibly tell such a thing?" (Doc. 55-1, Hodges Dep. 79:9-13). Hodges said that Lingwall said "Oh, I can just see it on them, I can see the shame on their face, they look like they have been crying all weekend and they wear these big baggy hoodies." (Doc. 55-1, Hodges Dep. 79:19-25). Hodges testified that his comments had a big impact on her and that she "kind of quit wearing hoodies to work and . . . always wanted to make

sure her makeup was good because it wasn't the only time he brought up clothing." (Doc. 55-1, Hodges Dep. 79:19-25).

### B. Dr. Gaddamshetty comments

Hodges testified that when she was first getting going, she asked to have Dr. Gaddamshetty on her PhD committee. (Doc. 55-1, Hodges Dep. 87:15-25). Hodges testified that Dr. G mentored most of the PhD students and was an amazing researcher. (Doc. 55-1, Hodges Dep. 87:15-25). She testified that Lingwall told her that she did not want Dr. G on her committee "because he takes research really seriously." (Doc. 55-1, Hodges Dep. 87:15-25). Hodges testified that she told Lingwall "Yes, that's exactly what I want, I want my research to be taken very seriously and I want to publish in journals and I want to do all of this." (Doc. 55-1, Hodges Dep. 87:15-25). Hodges testified that Lingwall again told her she did not want Dr. G on her committee and believes it was one of the times he said that he was her "PhD advisor and you have to listen to me." (Doc. 55-1, Hodges Dep. 87:15-88:3).

### C. Pregnancy comments

At one unspecified time prior to graduation, Hodges testified that Lingwall told her "By the way, if you get pregnant, you are not to say anything about it, you must not tell me anything, I don't want to know, do not tell me." (Docs. 55-1, Hodges Dep. 92:11-22; 56, PSOMF, ¶ 50; 58, ¶ 50). Hodges testified that from that and other conversations around pregnancy, Hodges was led to believe she was not supposed to get pregnant, that Lingwall would not have found that acceptable, and would have impacted her ability to continue with the Research Scientist II position. (Docs. 55-1, Hodges Dep. 92:18-22; 56, PSOMF, ¶ 50; 58, ¶ 51).

### D. "Him and the guys from Utah"

It is unclear from the record exactly when this incident occurred, but it appears that it was around 2018 and 2019, and certainly before graduation, and before she was hired as a Research Scientist II. (Doc. 55-1, Hodges Dep. 75:14-22, 77:24-78:5). Hodges testified that she was conducting research testing on mine tailings as instructed by Dr. Lingwall, and it was for a research paper that he was publishing. (Doc. 55-1, Hodges Dep. 77:3-11). Hodges asked if she could be in on the paper because she had been wanting to publish some papers, and he pretty much told her no, that it was for "him and the guys from Utah." (Doc. 55-1, Hodges Dep. 77:3-11). Hodges

testified that it seemed clear to her that she was being excluded from the paper due to her being female. (Doc. 55-1, Hodges Dep. 77:3-11).

After this incident, but still in 2018 or 2019, Hodges testified that she had a meeting with Lingwall and he told her his colleagues from Utah were coming up and they were going over some stuff. (Doc. 55-1, Hodges Dep. 77:22-11). Hodges testified that he asked her thoughts on the topic and that she gave him a lot of ideas about how to present it. (Doc. 55-1, Hodges Dep. 78:2-5). Hodges testified that either during her meeting with Lingwall, or shortly thereafter, Lingwall told her she should stop by when the guys from Utah were there, although she got the impression that his invitation was not genuine. (Doc. 55-1, Hodges Dep. 78:6-11). Hodges testified that she figured she better stop by the meeting because Lingwall was her supervisor, but that when she got there, it was very uncomfortable. (Doc. 55-1, Hodges Dep. 78:12-19). Hodges testified:

> It really felt like I was being showed off. I wasn't asked about any intellectual contributions, it was pretty much like walk in, I wasn't invited to sit down, it was pretty much like I could feel it was going to be odd, but it was walk in, show me off to his colleagues, and it was like, okay, now you can go and let the boys discuss the important part is what it felt like.

(Doc. 55-1, Hodges Dep. 78:12-19). Hodges testified that she felt "kind of like [she] was a trophy. . .like [she]was an object to him" because she was female and that she "wasn't given the same respect that a man might be." (Doc. 55-1, Hodges Dep. 78:20-25).

### E. Sleeps with men comment

Hodges testified that one time, prior to moving offices, Lingwall came into her office and handed her a flier or packet of Geo-Congress and it had people listed in it. (Doc. 55-1, Hodges Dep. 80:8-22). Hodges testified that Lingwall told her that she needed to get to know these people because it will help her in her career. (Doc. 55-1, Hodges Dep. 80:8-22). Hodges testified that Lingwall referenced one particular woman listed in the flyer and said that "she's just at conferences to sleep with men." (Doc. 55-1, Hodges Dep. 80:8-22). Hodges asked Lingwall why he would think that and Hodges testified that Lingwall responded that he can "tell by the way she walks around and [ ] struts her stuff and [ ] wears the clothes she wears, she is just there to sleep with men." (Doc. 55-1, Hodges Dep. 80:8-22). Hodges testified that these comments left an impression on her because "he's a professor talking about his colleagues, his peers, in this manner, other women, and I'm trying to be—he's the one that's supposed to be building me up to this level. And

so he would disregard other women like that too, just, oh, they are just in this field to find a husband or sleep with men." (Doc. 55-1, Hodges Dep. 80:23-81:4).

### F. Dr. Benning leaving the department comment

Hodges testified that at one unspecified time, but prior to her being hired as a Research Assistant II, Lingwall told her that Dr. Benning, a female colleague of his, left the department when she found out that Dr. Lingwall and another man new to the department were paid more than she was when she was a tenured professor who had been there for awhile. (Doc. 55-1, Hodges Dep. 87:3-14).

### G. Men should be paid more than women

On March 16, 2020, Hodges emailed Lingwall stating that she had not heard from human resources yet about approving her for full-time status, questioned whether human resources was too preoccupied with addressing COVID-19, and asked whether she should hold off on Hazwopper training until she officially started work on the pond project. (Doc. 55-3 at 687). Lingwall did not respond to Hodges's question on whether to begin the Hazwopper training, but stated that the hold up on full-time approval was payroll. (Doc. 55-3 at 687). In an email to Hodges, Lingwall stated:

> On the full-time. . . . the hold up right now is at payroll. The issue is that your annual leave was not accounted for in the proposal budget by OSP, so your total compensation goes over the initial budget by $300. OSP denies that it was missed, but they always miss it and we always have to do this dance for Research Scientists on every project. Andrea can testify to that. One option is to reduce annual salary a few pennies to keep the total compensation constant (which is not the preferred solution). The other options include moving $300 of funds from other persons/tasks to keep the annual salary as it is and slightly increase the total compensation of vacation plus benefits plus salary. Payroll has run numbers and suggested a solution that does not decrease salary to compensate for the annual leave accrual on the overall budget. I think we should have that approved today and you won't see a decrease in salary to make up for the $300 of vacation days. Parenthetically, you should make sure that you take every scrap of leave that you accrue.... It's a use-it or loose-it situation with annual leave, though I don't know how it rolls over year-to-year since I don't get vacation days and I've never had to look into it.

(Doc. 55-3 at 687). Hodges testified that Lingwall told her the hold up was that Hodges was "paid too much," that "it's too much pay so it's taking us awhile to get you added to the project." (Doc. 55-1, Hodges Dep. 88:14-24). Hodges testified that Lingwall told her that she was "paid even more than Curt" who was a male Research Scientist working on the Pond Project and said "that's

what's funny about this, that shows you how much more engineers are paid than scientists because a female engineer is paid even more than a male scientist." (Doc. 55-1, Hodges Dep. 89:2-9). Hodges testified that Lingwall then told her that "We got a good chuckle about that, ha, ha, because it's supposed to be the other way around, men are supposed to get paid more than women." (Doc. 55-1, Hodges Dep. 89:2-9).

### H. Similarly-situated male

Hodges questioned Lingwall why she was not named a co-principal investigator on the EAGER project despite contributing to the proposal. (Doc. 52, ¶ 31; 56, ¶ 31). Hodges testified that Lingwall repeatedly told Hodges it was the South Dakota Board of Regents that would not allow an RSII to be a co-PI on a project. (Docs. 56, PSOMF, ¶ 69; 58, ¶ 69; 55-1, Hodges Dep. 112:5-23). Lingwall testified that:

> [M]y interpretation of the National Science Foundation PAPPG, which is their proposal guide, PAPPG, gives specific direction on what a principal investigator on a National Science Foundation project should be versus senior personnel versus other personnel. And our interpretation, mine and subsequent other projects where we have had similar discussions, is that a research scientist II does not meet the definition of a principal investigator or PI by the National Science Foundation, which is the funding agency for which we were pursuing funding.

(Docs. 52, ¶ 32; 56, PSOMF, ¶ 32; 53-5, Lingwall Dep. 153:4-17). Ultimately, Dan Soeder, Dr. Sani, Dr. Ustenisik and Lingwall were named co-PI's. (Doc. 55-1, Hodges Dep. 111:9-17). Soeder, Sani, and Lingwall were males and Ustenisik and Hodges were the females working on the project. (Docs. 56, PSOMF, ¶ 72; 58, ¶ 72). Lingwall, Dr. Sani, and Dr. Ustunsisik were professors at the School of Mines and Dan Soeder was a consultant and former employee of Lingwall's. (Docs. 55-1, Hodges Dep. 111:16-23; 53-5, Lingwall Dep. 109:15-17).

Hodges found out her friend Govind Chilkoor, who was male, was permitted to be a co-PI on a project. Chilkoor had gone through the PhD program with Hodges and Hodges testified that he was also a Research Scientist II. (Doc. 55-1, Hodges Dep. 112:14-23). Hodges testified that when she told Lingwall that Govind was allowed to be a co-PI, Lingwall got defensive and demeaned her work, saying "that's different, it's his ideas." (Doc. 55-1, Hodges Dep. 112:24-113:4). Govind Chilkoor was co-PI on two Awards in January 2020. (Docs. 56, ¶ 70; 58, ¶ 70). One project had an original PI and three co-PIs, and the second project had a PI and two co-PIs. (Docs. 56, PSOMF, ¶ 70; 58, ¶ 70).

## IV.    Motion for Summary Judgment

On October 11, 2023, Board of Regents filed a Motion for Summary Judgment. (Doc. 50). The motion has been fully briefed. On March 25, 2024, the Court held oral argument on the Motion. In her opposition brief and at oral argument, Hodges states that she was withdrawing her FLSA claim. Her remaining claims are: 1) Title VII sex discrimination claim; 2) Title IX sex discrimination claim; 3) Title VII retaliation claim; 4) retaliation and reprisal claim for complaint about wages in violation of South Dakota public policy, including SDCL 60-11-17.1.

## STANDARD OF REVIEW

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). To meet this burden, the moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact, or must show that the nonmoving party has failed to present evidence to support an element of the nonmovant's case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.

Once the moving party has met its burden, "[t]he non-moving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods, Mo.*, 415 F.3d 90-8, 910 (8th Cir. 2005) (internal quotations and citation omitted). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, the dispute must be outcome determinative under prevailing law." *Id.* at 910-11. Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In ruling on a motion for summary judgment, the Court is

required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStar Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).

## DISCUSSION

### I.   Title VII and Title IX Claim

In Claims I and II of Hodges's First Amended Complaint, she alleges that she was discriminated against on the basis of her sex in violation of Title VII of the Civil Rights Ac, 42 U.S.C. § 2000e et seq. and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (Doc. 36).

Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex[.]" 42 U.S.C. § 2000e-2(a). Discrimination occurs when "sex was a motivating factor for any employment practice, even though other factors also motivated the practice." *Lewis v. Heartland Ins. of Am., LLC*, 591 F.3d 1033, 1037 (8th Cir. 2010) (citing § 2000e-2(m)).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Eighth Circuit Court of Appeals has not ruled on whether Title IX implicitly includes a private cause of action for sex discrimination in employment, and there is currently a circuit split on the issue. *Libault v. Mamo*, Civ. No. 4:22-3096, 2023 WL 3011259, at *7 & n.3 (D. Neb. Mar. 20, 2023) (listing cases), *aff'd*, Civ. No. 23-1802, 2023 WL 6532621 (8th Cir. Oct. 6, 2023). Nonetheless, the Court need not decide the issue because the Eighth Circuit has held that, "for employment discrimination cases, 'the Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX.' " *Brine v. Univ. of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996) (quoting *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988)); *see also Libault*, 2023 WL 3011259 at *7.

To defeat summary judgment on her discrimination claim, Hodges must either show direct evidence of discriminatory motive or intent, or rely on the burden-shifting method in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), to create an inference of discrimination. *Esperance v. Vilsack*, Civ. No. 5:20-5055-LLP, 2023 WL 5431858, at \*3 (D.S.D. Aug. 23, 2023) (citing *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 825-26 (8th Cir. 2017)).

Direct evidence establishes a "specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (citing *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006)).

If an employee "lacks evidence that clearly points to the presence of an illegal motive, [s]he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas*" burden shifting framework. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); s*ee also McCullough v. Univ. of Ark. For Med. Sciences*, 559 F.3d 855, 861 (8th Cir. 2009). Under the *McDonnell Douglas* framework, an employee must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 477 U.S. at 802. If the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Id.* If the employer puts forth such a reason, the employee "must then present evidence sufficient to raise a question of material fact as to whether [the employer's] proffered reason was pretextual and to create a reasonable inference that [sex] was a [motivating] factor in the adverse employment decision." *See Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000); *see also Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (stating that to create a genuine issue of material fact on pretext "the ultimate question is whether the plaintiff presents evidence of conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motiving factor in [the employer's] decision. . . . .").

Although intermediate burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of demonstrating that the defendant intentionally discriminated always remains with the plaintiff. *Esperance*, 2023 WL 5431858 at \*3 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (admonishing that at all times the Title VII plaintiff holds "the ultimate burden of persuasion")).

Both parties analyze this case under the *McDonnell Douglas* burden-shifting framework and the Court will do the same.

## A. Plaintiff's Prima Facie Case

Board of Regents does not dispute that Hodges is a member of a protected group, and "acknowledges that non-renewal of her employment contract would be considered an adverse employment action." (Doc. 51 at 436). Board of Regents argues, however, that Hodges has not established a *prima facie* case of sex discrimination because she was not meeting legitimate job expectations of a Research Scientist II. (Doc. 51 at 436-37). In addition, Board of Regents argues that Hodges has failed to show that the nonrenewal of her contract was under circumstances giving rise to an inference of unlawful discrimination because she has not shown that similarly-situated male employees were treated differently. (Doc. 51 at 436-37).

Under *McDonnell* Douglas, an employee must first establish a *prima facie* case of discrimination. A *prima face* case of discrimination requires that Hodges show she: (1) is a member of a protected class; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of gender discrimination. *See Gibson v. AM. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012); *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 879 (8th Cir. 2010). The Eighth Circuit has "recognize[d] that the threshold of proof necessary to make a *prima facie* case is minimal." *Rose-Maston v. NME Hosps. Inc.*, 133 F.3d 1104, 1109-10 (8th Cir. 1998).

Because the burden of proof necessary to make out a *prima facie* case is minimal, the Court will presume, without deciding, that Hodges has established a *prima facie* case of sex discrimination.

## B. Non-Discriminatory Reason

If an employer can articulate a legitimate, non-discriminatory reason for the adverse employment action, then the presumption of discrimination created by a plaintiff's *prima facie* case disappears. *Young v. Builders Steel Co.,* 754 F.3d 573, 578 (8th Cir. 2014). "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Anderson v. KAR* Global, 78 F.4th 1031, 1038 (8th Cir. 2023) (quoting *Floyd v. Mo. Dep't of Soc. Servs., Div. of Fam. Servs.*, 188 F.3d 932, 936

(8th Cir. 1999)); *see also Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005) (stating that the employer's burden can be met with "[a] minimal evidentiary showing."). The employer's burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

It is unnecessary for an employer to prove "that it was actually motivated by the proffered reasons." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," *Burdine*, 450 U.S. at 254-55, by " 'set[ting] forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action," *Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 254-55).

In the June 19, 2020, letter informing Hodges of the nonrenewal of her contract, School of Mines indicated that the reason for the nonrenewal was "budget deficiencies." In its brief in support of its Motion for Summary Judgment, Board of Regents states that productivity and performance issues also motivated the decision not to renew her contract. Board of Regents states that:

> Hodges' productivity and performance issues were directly related to the budget of each project which was funded by grants. A discrete amount of funds granted by the [National Science Foundation] for the Termite Project had been allocated specifically for Hodges' position. Hodges' lack of productivity resulted in 'burning' grant funds more quickly. In other words, her inability to complete tasks in a timely manner meant that particular project goals would not be met by the time the time grant funding for the NSF was exhausted.

(Doc. 51 at 437). Board of Regents states that Hodges's productivity issues stemmed, in part, from her alleged "pattern of refuting [Lingwall's] instructions, refusal to complete work and insubordination [that] [ ] emerged prior to the [work improvement plan] being issued and continued thereafter." (Doc. 51 at 440). Board of Regents states that "This inability of Hodges to complete assignments, and resulting accelerating burn rate, was the chief concern leading to her non-renewal. Corollary to this issue, Lingwall and Hodges were unable to work together, which was a contributing factor which led to the non-renewal of Hodges's employment contract with [Board of Regents]." (Doc. 51 at 440). Lingwall testified that it increasingly became clear that Hodges

would not "do anything that [he] asked because [he] was the one that was asking," and that "if a person working under your supervision will not work under your supervision and their only funding is coming from working under your supervision, it makes little sense to continue employment." (Doc. 55-2, Hodges Dep. 162:1-8).

There is ample evidence that budget and productivity considerations factored into the non-renewal of Hodges's contract. The Termite and Pond projects were fixed-length contracts funded by a grant award. Although School of Mines obtained a one-year extension on the project deadlines due to the COVID-19 pandemic, the projects were not awarded additional grant money. There is ample evidence in the record that Lingwall was concerned about missed deadlines and Hodges's progress on work assigned. Specifically, Lingwall expressed frustration over Hodges missing the EAGER proposal deadline. In addition, in an April 24, 2020, email to Hodges, Lingwall stated "We missed this last week's bi-weekly update due to the holiday, so one is due Monday morning. I'm eager to hear what you accomplished in the three weeks since the last update. . .Once you send the bi-weekly update, I will add some specific details and deadlines to it to help with the expectations we've been discussing today." (Doc. 55-23 at 818). The next Monday, April 27th, Hodges did not provide the bi-weekly update and appeared to also miss the May 1st deadline to complete her Hazwopper training. (Docs. 55-22 at 814-15; 55-23 at 817). The notes of Lingwall's conversation with Hodges on April 28, 2020, in which he introduced the work improvement plan, indicate that he did not believe she was making sufficient progress on project goals over the pay periods at issue. Dr. Lisa Kunza, the principal investigator on the Pond Project, also indicated in a June 2020 email that she was unsure how to certify Hodges's effort reports because Hodges "is not delivering 20 hrs/week of work on the project" and inquired "what steps [ ] [she] need[s] to take to stop paying Tasha for my project." Sometime in May 2020, Lingwall formulated a budget which showed that at the current burn rate, with Hodges's continued employment, they would need additional funds to complete the Termite Project. It is also evident from email communications in the record that tensions between Lingwall and Hodges grew rapidly when Hodges transitioned to the Research Assistant II position during the early days of the lockdown, and their relationship rapidly deteriorated, further hindering productivity. Economic and productivity considerations, as well as personality conflicts, have been held to be legitimate, non-discriminatory reasons for an adverse employment action and the Court finds that Board of Regents has met its burden to articulate a nondiscriminatory justification for the nonrenewal. *See*

*Lucke v. Solsvig*, 912 F.3d 1084, 1087-88 (8th Cir. 2019); *Groves v. Cost Planning & Mgmt. Int'l, Inc.*, 372 F.3d 1008, 1010 (8th Cir. 2004) (finding that employer's consideration of "productivity, project load, flexibility and seniority" are legitimate, nondiscriminatory reasons in reduction of force decisions); *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices.").

### C. Pretext

Board of Regents has set forth non-discriminatory reasons for the nonrenewal of Hodges's contract, citing to budget concerns, productivity, and Hodges's and Lingwall's deteriorating professional relationship. Accordingly, the presumption of discrimination disappears, requiring the plaintiff "to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515-16. To overcome these reasons and avoid summary judgment, Hodges must present evidence that "(1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [sex] was a [motivating] factor in the adverse employment decision." *See Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1336–37 (8th Cir.1996); *see also Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999). The plaintiff retains at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination. *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012).

A plaintiff generally may show that a proffered justification is pretextual in two ways. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). First, a plaintiff may rebut the factual basis underlying the employer's proffered explanation, thereby demonstrating that the explanation is unworthy of credence. *Id.* Second, a plaintiff may show that the employer's proffered explanation was not the true reason for the action, but rather that the impermissible motive more likely motivated the employer's action. *Id.* "In either case, the plaintiff must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive," *Barnhardt v. Open Harvest Co-op*, 742 F.3d 365, 371 (8th Cir. 2014), "even if that evidence does

not directly contradict or disprove the defendant's articulated reasons for its actions," *Lucke v. Solsvig*, 912 F.3d 1084, 1088 (8th Cir. 2019) (internal quotations and citation omitted).

Other ways a plaintiff may show pretext include "showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Curran v. Bernhardt*, Civ. No. 5:20-5009-LLP, 2023 WL 2586085, at *8 (D.S.D. Mar. 21, 2023) (quoting *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)).

Hodges contends that she has established that budget concerns were not the true motivation for the nonrenewal decision and that a reasonable inference may be made from the evidence that that the nonrenewal of her contract was motivated by intentional discrimination because: 1) a similarly-situated male colleague was given co-author privileges on papers and she was not; 2) School of Mines shifted the explanation for the nonrenewal of Hodges's contract; and 3) Lingwall allegedly made derogatory comments about women to Hodges during her 5-year tenure as Lingwall's supervisee. The Court will address each argument below.

### 1. Comparators

As evidence that sex was a motiving factor in the decision to not renew her contract, Hodges argues that she was treated less favorably than a similarly situated male colleague. (Doc. 54 at 640). Specifically, Hodges argues:

> Multiple times, Hodges questioned Lingwall about using her own work on proposals while she did not receive principal investigator ("PI") credit. Lingwall repeatedly told Hodges it was the South Dakota Board of Regents that would not allow an RS-II to be a co-PI on a project. Lingwall put all the blame on the Board of Regents. When Hodges found out her friend, classmate, and colleague Govind Chilkoor, who is male, was permitted to be co-PI on a project even though he was also an RS-II, Hodges took that information to Lingwall and asked why he was permitted to be a co-PI and Hodges was not. Lingwall got defensive and told Hodges, "That's different, that's his ideas," and demeaned Hodges and her work. But in looking at the website, Chilkoor got two co-PI credits in January 2020. Hodges got zero, at any time.

> Govind Chilkoor received his PhD from Mines in 2019, the same year as Hodges. Chilkoor was Co-PI on two Awards in January 2020. One project had an original PI and three co-PIs, and the second project had a PI and two co-PIs. On Chilkoor's projects that received awards in January 2020, all of the PIs or co-PIs were male.

Hodges was never permitted to be a PI or co-PI, while similarly situated males were permitted. And no other male was sent to human resources for standing up for themselves, because no male was given a work improvement plan for asking for more respect.

(Doc. 54 at 640-41).

A common approach to show pretext is to introduce evidence that the employer treated similarly-situated employees in a disparate manner. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds*, *Torgerson v. City of Rochester*, 417 F.3d 845 (8th Cir. 2011). "At the pretext stage, the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 808-09 (8th Cir. 2020). The comparator must be "similarly situated in all relevant respects." *Id.* This means that the comparator must "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014). "It is a plaintiff's burden to produce specific, tangible evidence showing a disparity in the treatment of similarly situated employees." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 882 (8th Cir. 2005).

The Court finds that Hodges has not met her burden establishing that Dr. Chilkoor was similarly situated in all relevant respects. Although Hodges argues that she and Chilkoor were both Research Assistant II's, Chilkoor's resume does not establish that he was in that position at the time the two projects on which he was co-PI received grant awards in January 2020. (Docs. 55-16; 55-17). Dr. Chilkoor's resume indicates that his Research Assistant duties culminated in August 2019, at which time he transitioned to a "Researcher" position, and then in December 2019, before the January 2020 grant awards for these projects, Chilkoor transitioned to a "Research Engineer" position. Moreover, Hodges has not provided any evidence showing that she and Chilkoor were subject to the same standards. It is undisputed that the papers on which Chilkoor was a co-PI were different from the papers on which Hodges sought co-PI privileges, and there is no evidence that Lingwall was also Chilkoor's supervisor on these papers.

**2. Shifting explanations**

The School of Mines stated in its June 2020 letter informing Hodges of the nonrenewal of her contract, that the reason for the nonrenewal was "budget deficiencies." In its brief in support of its Motion for Summary Judgment, Board of Regents argues that:

> Hodges' productivity and performance issues were directly related to the budget of each project which were funded by grants. A discrete amount of funds granted by the [National Science Foundation] for the Termite Project had been allocated specifically for Hodges' position. Hodges' lack of productivity resulted in "burning" grant funds more quickly. In other words, her inability to complete tasks in a timely manner meant that particular project goals would not be met by the time the time grant funding for the NSF was exhausted.

(Doc. 51 at 437). The School of Mines provides that Hodges's productivity issues stemmed, in part, from her alleged "pattern of refuting [Lingwall's] instructions, refusal to complete work and insubordination [that] [ ] emerged prior to the [work improvement plan] being issued, but continued thereafter, which further broke down the supervisor-supervisee relationship." (Doc. 51 at 440). Board of Regents provides that "This inability of Hodges to complete assignments, and resulting accelerating burn rate, was the chief concern leading to her non-renewal. Corollary to this issue, Lingwall and Hodges were unable to work together, which was a contributing factor which led to the non-renewal of Hodges' employment contract with [Boad of Regents]." (Doc. 51 at 440). Lingwall testified that it increasingly became clear that Hodges would not "do anything that [he] asked because [he] was the one that was asking," and that "if a person working under your supervision will not work under your supervision and their only funding is coming from working under your supervision, it makes little sense to continue employment." (Doc. 55-2, Hodges Dep. 162:1-8).

"[A] substantial change in an employer's legitimate, nondiscriminatory reason for firing an employee may be probative of pretext, but [the Eighth Circuit] ha[s] been clear that these discrepancies must actually be substantial." *Twiggs v. Selig¸* 679 F.3d 990, 994 (8th Cir. 2012). A "[s]ubstantial change in an employer's explanation over time can be evidence of pretext, but an elaboration generally is not." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012). "[A]rticulating additional reasons for terminating someone while not deviating from the originally stated reason is not problematic, especially where the additional reasons have 'generally been alternate ways of stating the original reasons offered.' " *Adkins v. Univ. of the Ozarks*, 262 F.Supp.3d 791, 803 (W.D. Ark. 2017) (quoting *Johnson v. Securitas Sec. Servs. USA,*

*Inc.*, 769 F.3d 605, 613 (8th Cir. 2014)).  "A plaintiff claiming shifting explanations to support pretext must show that the reasons are completely different, not minor discrepancies." *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1018 (8th Cir. 2017).

There is ample evidence in the record that Lingwall was concerned about the "burn rate" of the National Science Foundation grant that funded the Termite Project.  The Court finds that productivity issues, whether resulting from Hodges's own mismanagement, COVID-19 project constraints, or the deteriorating communications and relationship between Hodges and Lingwall, underly the School of Mines's budget concerns and thus are not substantial discrepancies sufficient to support a finding of pretext.

### 3. Lingwell's comments

Hodges argues that budget concerns were not the true reason[1] behind the decision to not renew her contract because there is no evidence that these concerns arose prior to the nonrenewal decision. (Doc. 54 at 639-40).  Hodges points to comments made by Lingwall[2] that discrimination, rather than budget concerns, was more likely the reason for the nonrenewal.

Even if the Court was to assume for purposes of this Motion for Summary Judgment that a question of material fact exists as to whether budget concerns were the real reason for the nonrenewal, the Court finds that Hodges has failed to demonstrate that a jury could reasonably

---

[1] To the extent that Hodges is arguing that School of Mines's budget deficiencies justification has no basis in fact, the Court rejects such an argument and finds that Hodges has presented insufficient evidence to cast doubt upon factual basis of the Board of Regent's budget justification for the nonrenewal.  The Termite Project was a fixed-length contract funded by grant awards.  Although School of Mines obtained a one-year extension on the project deadline due to the COVID-19 pandemic, the project was not awarded additional grant money.  In early May, Lingwall provided School of Mines a budget analysis estimating that they would save $40,000 and finish the Termite Project on budget if they no longer had to pay for Hodges's salary. (Doc. 54, ¶ 51; 56, ¶ 51).  Hodges has not provided any evidence demonstrating that budget concerns had no basis in fact, although she takes issue with the amount of savings that a nonrenewal of her contract provided. (Doc. 56, ¶ 51) ("No explanation was provided for the $40,000, but even if cutting Hodges would result in savings, the savings would be at most $14,300 over the six-month period.").

[2] Board of Regents argues that the Court may not consider these comments as evidence of discriminatory animus by Lingwall because they precede January 7, 2020, which Hodges indicated in her EEOC Charge of Discrimination was the earliest date the discrimination took place. (Docs. 51 at 432; 57 at 856).  Board of Regents argues that any allegations of discrimination occurring before this date remain unexhausted and are barred by the statute of limitations. (Doc. 57 at 856).  The Court need not address this issue because the Court finds that even if the Court was to consider these statements in its summary judgment analysis, they are insufficient to create a reasonable inference that discrimination was a motivating factor in the nonrenewal of Hodges's contract.

infer from the evidence presented that discrimination was more likely than not the reason for this adverse action.

In support of her argument that discrimination was more likely the reason for the nonrenewal of her contract, Hodges points to derogatory comments that Lingwall allegedly made to Hodges about women during her 5-year tenure as Lingwall's supervisee. Hodges argues that these comments by Lingwall over a 5-year period create an inference that her sex was a motivating factor in the non-renewal of her employment contract. As detailed in the fact section of this opinion, the derogatory comments highlighted by Hodges include: 1) Lingwall allegedly saying in 2016 that he can tell when his female students were raped over the weekend; 2) Lingwall's comment that Hodges did not want Dr. Gaddamshetty on her PhD committee "because he takes research really seriously" that appears to have been made when Hodges first started on her PhD track; 3) Lingwall's comment made in 2018 or 2019 before she was hired as a Research Scientist II that when she asked to be a co-author on a paper, Lingwall said "no" and that the paper was for "him and the guys from Utah;" 4) alleged pregnancy-related comments directed to Hodges during her PhD pursuit; 5) Lingwall's comment made during Hodges's PhD studies that a female colleague listed in a Geo-Congress brochure went to conferences "just to sleep with men;" 6) Lingwall's comment that Dr. Benning, a female colleague of his, left the department when she found out that male colleagues, less experienced and newer to the department, were paid more than she; 7) Lingwall's alleged February or March 2020 comments made while Lingwall was seeking approval for Hodges to move to full-time employment, that Hodges was paid more than Curt, a male Research Scientist working on the Pond Project, that it "shows you how much more engineers are paid than scientists because a female engineer is paid even more than a male scientist," and that he and his colleagues got a good chuckle about that "because it's supposed to be the other way around, men are supposed to get paid more than women." (Doc. 54 at 627-29). Hodges argues that a reasonable inference can be made from Lingwall's comments that "he felt women were subordinate to men; and, that Hodges was subordinate to him," and that he did not renew her contract when she, after four-and-a-half years working with Lingwall, asked him "to treat her with the respect that she deserved as a person, a colleague, a fellow academic, and an employee of Mines." (Doc. 54 at 626).

The Court notes that Hodges has done a poor job of establishing for the record when many of these comments were made by Lingwall. The fact that many of these statements, however, were made before Lingwall hired Hodges as a Research Assistant II to work on the Termite Project, creates a strong inference that discrimination was *not* a motivating factor in the decision not to renew Hodges's contract. *See Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1997) (stating that there is "a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time."); *see also Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (same). Additionally, the Court finds that many of these comments are not evidence of discriminatory intent, but rather are facially neutral. *See, e.g., Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012) (finding that the "green card" statement is "facially neutral as to national origin" because it is not "charged with national-origin discriminatory animus or carr[y] the distinct tone of such motivation or implication."); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 & n.5 (8th Cir. 2006) (declining to extrapolate racial animus from statements such as "you don't known your place" and "Midwest nice," without providing any factual support or context for such speculation, and finding such phrases to be materially different from the historically racially disparaging but facially-neutral term "boy" deemed probative of racial animus in *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006)); *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (finding that comments that employee was not "humble enough" and "too prideful" were facially race-neutral). The fact that Lingwall may have relayed to Hodges a rumor that a female colleague left because of pay disparities is not probative of discriminatory intent in the nonrenewal of Hodges's contract. The Court also finds Lingwall's "me and the guys from Utah" comment and his comment that Dr. Gaddamshetty should not serve on Hodges's PhD committee because he "takes research really seriously" to be to be facially neutral. Even if the Court was to consider some of Lingwall's comments as evidence of discriminatory animus, many were made early during Hodges's tenure as a PhD candidate and are too remote in time to serve as evidence of pretext. *See Calder v. TCI Cablevision of Missouri, Inc.*, 298 F.3d 723, 730 (8th Cir. 2002) ("Because none of these remarks occurred within one year of Calder's termination and none were repeated, they do not create a triable issue on the question of pretext."); *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 427-28 (8th Cir. 1999) (holding that evidence that the supervisor made alleged discriminatory comments some two years prior to the termination was insufficient to support a finding of pretext);

*McWhorter v. Maynard, Inc.*, 802 F.Supp.2d 990, 995 (W.D. Ark. 2011) (finding that while the supervisor's remarks might be seen as evidence of some discriminatory animus, they were "somewhat outdated" and lacked significant probative value because the comments were not directed specifically at the plaintiff and occurred almost one year before plaintiff was terminated). Finally, Lingwall's alleged February or March 2020 remark that Hodges makes more than Curt, a fellow Research-Scientist on the Pond Project, "which is funny because men should be paid more than women," is not probative of discriminatory animus with regard to the nonrenewal of Hodges's contract because it was spoken as Lingwall was working with administrators at the School of Mines to be able to hire and pay Hodges for a 20-hour a week position working as a Research Assistant II on the Pond Project.

The Court finds that budget and productivity issues became a concern on the Termite and Pond projects during the early days of the COVID lockdown. Materials for the labs were delayed as a result of the pandemic, project participants had to transition to more remote work, and access to resources needed for these projects was more limited. These projects were fixed-length contracts funded by grant awards. Although School of Mines obtained a one-year extension on the Termite project deadline due to the COVID-19 pandemic, the project was not awarded additional grant money. There is evidence that productivity issues arose whether due to COVID delays, poor communication between Hodges and Lingwall, or Hodges's own mismanagement. Tensions between Lingwall and Hodges grew rapidly when Hodges transitioned to the Research Assistant II position during the early days of the lockdown, and their relationship rapidly deteriorated, further hindering productivity.

Hodges argued at the motion hearing that the personality conflict that developed between she and Lingwall and productivity issues were a product of discrimination. She argues that the derogatory comments that Lingwall made about women during their five-year tenure working together demonstrate that Lingwall harbored discriminatory animus toward powerful women and demonstrated his belief that women should remain subordinate to men. (Doc. 54 at 627). The Court finds that this theory is based on speculation, and is not a reasonable inference to be made from the alleged comments. *See Mayorga v. Marsden Bldg. Maint., LLC*, 55 F.4th 1155, 1162 (8th Cir. 2022) (stating that "[r]easonable inferences are those that can be drawn from the evidence without resort to speculation," and finding that plaintiff offered no evidence to support her

allegation that her supervisor terminated her because "he could not tolerate being challenged by a woman."); *see also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) ("While we are required to make all reasonable inference in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation."). Aside from these comments, Hodges has provided no other evidence showing that Lingwall harbored discriminatory animus towards his many other female colleagues or towards women generally.

An employer may terminate an employee due to budget concerns, personality conflicts, performance issues, or for no reason at all as long those judgments did not involve intentional discrimination. *See Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices. Federal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.' "); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir. 1995) ("An employer has the right to . . . discharge—for good reason, bad reason, or no reason at all, absent intentional . . . . discrimination."). The Court finds that the comments made by Lingwall before Hodges was hired as a Research Assistant II do not create a reasonable inference that the decision to not renew Hodges's contract is " 'more likely than not' explained by an intent to discriminate against her on the basis of her sex." *See Mayorga*, 55 F.4th at 1162. Accordingly, Board of Regent's Motion for Summary Judgment is granted as to Hodges's sex discrimination claims.

## II.   Retaliation Claim in Violation of Title VII and SDCL 60-11-17.1.

### A.   Title VII Retaliation Claim

In Claim III of Hodges's First Amended Complaint, she alleges that her contract was not renewed and she was effectively terminated in retaliation for making reports of discriminatory conduct in violation of Title VII. (Doc. 36 at 336).

Title VII prohibits retaliation against employees who allege, or participate in an investigation or proceeding alleging, a violation of Title VII by his or her employer. *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007).

To defeat summary judgment, a plaintiff asserting a retaliation claim under Title VII must produce either direct evidence of retaliation or create an inference of it under the *McDonnell Douglas* burden-shifting framework. *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011). If a plaintiff produces direct evidence, evidence of the employer's motives for a termination is an issue for trial, not summary judgment. *Id.*

Here, Hodges has produced no direct evidence of discrimination and proceeds in her brief to establish an inference of retaliation under the *McDonnell Douglas* burden shifting framework. Under this framework, an employee has the initial burden of establishing a *prima facie* case of retaliation. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). If an employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to produce some legitimate, non-discriminatory reason for the adverse action. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000). If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for retaliation. *Id.* Ultimately, the plaintiff must establish the employer's adverse action was based on intentional discrimination. *Id.*

### 1.  Prima Facie Case

To make out a prima facie case of retaliation, a plaintiff must show: (1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1069 (8th Cir. 2017); *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012). "[R]etaliation must be the 'but for' cause of the adverse employment action." *Jackman v. Fifth Judicial Dist. Dept. of Correctional Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision" to take the adverse employment action. *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2d Cir. 2015)).

### i.      Protected Activity

Under Title VII, "protected activity" includes opposition to discriminatory employment practices prohibited under Title VII. *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007). Such practices are those that discriminate with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." *Warren*

*v. Kemp*, 79 F.4th 967, 974 (8th Cir. 2023) (citing § 2000e-2(a)(1)). The Eighth Circuit Court of Appeals has rejected Title VII retaliation claims where the plaintiff opposed conduct other than a discriminatory employment practice. *See id.* (citing cases). However, a plaintiff need not establish that the conduct which she opposed was in fact discriminatory, but rather must demonstrate a "good faith, reasonable belief" that the underlying challenged conduct violated Title VII. *Id.* Additionally, a plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a *prima facie* case of retaliation. *Buettner*, 216 F.3d at 715.

Hodges argues that she complained in March 2020 about wages, and in April 2020 about discriminatory treatment, and that because of these complaints, Lingwall made the decision to not renew Hodges's employment contract. (Doc. 54 at 653). Hodges asserts that in March 2020, she told Lingwall that she would not work full time unless she was going to get paid for it. (Doc. 56, PSOMF, ¶ 22). With regard to the April 2020 comment, it appears that Hodges is referring to a phone call on April 28th in which Lingwall apprised Hodges that she would be placed on a work improvement plan. (Doc. 54 at 634-35). Lingwall testified that during the conversation, Hodges called him a liar, jerk, arrogant, selfish, controlling, and that "she gave a reference to this is typical male man behavior, something along those lines, something that had to do with gender" and that he remembered her saying something about "chauvinism." (Doc. 53-5, Lingwall Dep. 123:22-124:13). Lingwall testified that her comments related to gender appeared to be specific to the moment and the issuance of the work improvement plan and that he did not get the sense it was a long-standing brewing sentiment. (Doc. 53-5, Lingwall Dep. 124:9-125:18). Lingwall testified that Hodges was angry and that these comments appeared "like more a slip of the tongue type thing." (Doc. 53-5, Lingwall Dep. 124:9-125:18).

With regard to the March 2020 comment by Hodges, the Court finds that no reasonable inference may be made that this constituted a protected activity. While the March 2020 pay comment may have alerted Lingwall to the fact that Hodges was not being paid fully for the time she worked, no inference can be made from this comment that Hodges was complaining about being discriminated against on the basis of her sex. *See Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (stating that although the plaintiff complained that she was entitled to a pay increase and a change in job title, "she did not attribute NPPD's failure to give

her a raise or promotion to sex discrimination," so she "was not engaged in a protected activity for purposes of Title VII").

With regard to the April 2020 comment, the Court will assume without deciding, that Hodges's somewhat ambiguous, gender-related comments to Lingwall during their April 28, 2020, phone conversation were protected conduct even though it is questionable whether Hodges possessed a good faith, reasonable belief at that time that her sex was a motivating factor in the implementation of her work improvement plan. *See Warren v. Kemp*, 79 F.4th 967, 974 (8th Cir. 2023) ("A plaintiff need not establish the conduct which she opposed was in fact prohibited under Title VII; rather, [s]he need only demonstrate that [s]he had a 'good faith, reasonable belief that the underlying challenged conduct violated Title VII.'"). O'Neill's notes from phone conversation that Hodges had with O'Neill the day after she was informed by Lingwall of the work improvement plan, indicated not that Hodges believed the work improvement plan to be discriminatory, but that the "lack of priorities [was] the overarching problem in their communication," that she did not feel any decline in productivity was allowed, and that Lingwall was rude and awful and required her to work all of the time and gave her no time to decompress. (Docs. 53-7 at 510; 55-24 at 822). She subsequently expressed in an email to Lingwall, O'Neill and Kenner that she "truly believe[s] this situation has escalated to the level it has due to the increased difficulty in communication due to coronavirus complications." (Doc. 53-8 at 539-40). It was not until May 7, 2020, that Hodges first inquired about filing a formal harassment and bullying complaint against Lingwall. (Doc. 53-8 at 546).

That being said, at least in retrospect, it appears that Lingwall believes Hodges was engaging in a protected activity by her angry comments. When asked whether he reported her gender-related comments to Human Resources, Lingwall testified that he did not because Hodges was angry, he wasn't thinking, and "in the cold light of three years later, it seems that it should have been reported amongst the first things, but at the time, in the confusion, the chaos, the trauma, I didn't think to report that, nor did I report to my memory, any. I just remember saying we have had a difficult conversation, there's a crisis brewing, I need human resources to step in before things get any worse." (Doc. 53-5, Lingwall Dep. 124:14-25). Based on this testimony, the Court will assume without deciding that Lingwall should have known that Hodges was engaged in a protected activity. *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000) (citing

*Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998) ("A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation.")).

## ii.      Inference of Causation

"The timing of an adverse employment action in connection with the protected activity can sometimes establish causation for purposes of establishing a *prima facie* case." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (internal quotations omitted); *see also Peterson v. Scott Cty.*, 406 F.3d 515, 525 (8th Cir. 2005), *abrogated on other grounds*, *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (two weeks from the protected activity, is close enough to establish causation in a *prima facie* case."); *see also Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002) (finding two-week gap "sufficient, but barely so, to establish causation"); *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir. 2010), *abrogated on other grounds*, *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (finding that a one month gap is not close enough to establish a *prima facie* case absent additional evidence). "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011).

Assuming for purposes of this motion that Hodges's April 28th gender-related comments to Lingwall constituted a protected activity, even though other portions of the conversation appear to be insubordinate,[3] the Court finds that Lingwall's May 3, 2020, internal email indicating that they would not be renewing Hodges's contract, and the June 19, 2020 letter informing Hodges of the nonrenewal, is sufficient evidence of causation to establish a *prima facie* case of retaliation.

## iii.      Pretext

---

[3] The presumption of a protected activity in the lengthy April 28, 2020, telephone call is not turned into an unprotected activity by the apparently insubordinate portions of the same conversation. There were claims of protected activity calling the work improvement plan of Lingenwall's typical male behavior and chauvinism. Other portions of the conversation were apparently insubordinate but not so clearly so in the record as to call them insubordinate as a matter of law. *See Kiehl v. Selected Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999) (*en banc*) (concluding that despite a prompt apology, an employee's angry outburst was intervening unprotected conduct that eroded any causal connection that was suggested by the temporal proximity of the employee's protected conduct and his termination).

Even if Hodges could establish a *prima facie* case, her retaliation claim would still fail because she cannot demonstrate that Board of Regents's legitimate, non-discriminatory reason for her termination—budget deficiencies, productivity, and the deteriorating professional relationship between Hodges and Lingwall—was a pretext for retaliation. In order to succeed on her claim, Hodges "must both discredit [Board of Regent's] asserted reasons for [the non-renewal of her contract] and show that the circumstances permit drawing a reasonable inference that the real reason for [her] termination was retaliation." *Hutton v. Maynard*, 812 F.3d 679, 684 (8th Cir. 2016).

Hodges argues that temporal proximity of her complaints to the nonrenewal decision, "coupled with Lingwall's fanciful stories about why he contacted HR in the first place," are evidence of pretext for discrimination. (Doc. 54 at 653).

"Generally, [ ] more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Hervey v. County of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008); *see also Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (stating that temporal "proximity alone is insufficient to establish pretext."). "Rather, [courts] evaluate, the timing of the discharge . . . in light of other evidence, or lack of other evidence, in the record." *Gibson*, 776 F.3d at 541 (internal quotations omitted).

As discussed in reference to her sex discrimination claim, Hodges has produced no evidence that Board of Regents's proffered reasons for the nonrenewal of Hodges's contract— budget, productivity, and the deteriorating professional relationship between Hodges and Lingwall —had no basis in fact. As the Court has already explained, there is ample evidence in the record that these were real problematic issues on the projects Hodges was working on. Hodges has advanced no other evidence, other than the temporal proximity of the events, from which a jury could draw an inference that the real reason for Hodges's termination was retaliation.

Also undercutting the significance of temporal proximity is the fact that, as evidenced through email exchanges and Lingwall's notes of his April 28, 2020, conversation with Hodges, Lingwall expressed concerns about missed deadlines, productivity, and budget prior to the nonrenewal decision. *Carrington v. City of Des Moines*, 481 F.3d 1046, 1051 (8th Cir. 2007) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."); *See Smith v. Allen Health Sys., Inc.*, 302 F.3d

63

827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."). Specifically, Lingwall expressed frustration over Hodges missing the EAGER proposal deadline. In addition, in an April 24, 2020, email to Hodges, Lingwall stated "We missed this last week's bi-weekly update due to the holiday, so one is due Monday morning. I'm eager to hear what you accomplished in the three weeks since the last update. . .Once you send the bi-weekly update, I will add some specific details and deadlines to it to help with the expectations we've been discussing today." (Doc. 55-23 at 818). The next Monday, April 27th, Hodges did not provide the bi-weekly update and also appears to have missed the May 1st deadline to complete her Hazwopper training. (Docs. 55-22 at 814-15; 55-23 at 817; 55-15 at 786). O'Neill's notes from her April 28, 2020, conversation with Lingwall and Kenner, in which they agreed to place Hodges on a work improvement plan, indicate that Lingwall had concerns with missed deadlines and attitude issues. (Doc. 55-24 at 822). Email exchanges between Lingwall and Hodges show that tensions between them grew rapidly during Hodges's transition to Research Assistant II position during the early days of the COVID-19 lockdown, and that it increasingly became more difficult for them to work together. Regarding budget concerns, in Lingwall's April 28, 2020, conversation with Hodges to introduce the work improvement plan, his notes from the meeting indicate that he was concerned about her "salary [ ] burning," efficiency, and had concerns that cash was tight and "budgets are at a premium" (Doc. 53-7 at 513). In addition, as mentioned previously, the COVID-19 shutdown hampered productivity as lab materials were delayed and access to project resources was more limited due to people working remotely. The deadline for the Termite Project had been extended one year, but no additional grant funds were awarded. In May 2020, Lingwall conducted a budget analysis, forecasting that they would exhaust grant funds prematurely at the current burn rate.

As a whole, the Court finds that even if the evidence presented by Hodges is sufficient to establish a *prima facie* case of retaliation, no reasonable inference can be made that retaliation was the real reason for the nonrenewal of Hodges's contract.

### III.    Retaliation under SDCL 60-11-17.1 for making complaints about wages

Under South Dakota law, "retaliatory discharge is a tort arising from a breach of public policy duties independent of the employment contract." *Tiede v. CorTrust Bank, N.A.*, 748 N.W.2d

748, 752 (S.D. 2008). The South Dakota Supreme Court has recognized this public policy exception to the employment at-will doctrine. *See Johnson v. Kreiser's, Inc.*, 433 N.W.2d 225, 227 (S.D. 1988). An employee invoking the public policy exception bears the burden to prove that the dismissal "violates a clear mandate of substantial public policy." *Niesent v. Homestake Min. Co. of Cal.*, 505 N.W.2d 781, 783 (S.D. 1993). If the employee meets this threshold, "the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." *Donohue v. Arthur J. Gallagher & Co.*, Civ. No. 4:22-4044-KES, 2023 WL 3646534, at *2 (D.S.D. Mar. 30, 2023) (quoting *Johnson*, 433 N.W.2d at 227). The employee must then show "by a preponderance of the evidence that the discharge was for an impermissible reason." *Id.* (quoting *Johnson*, 433 N.W.2d at 227-28).

Whether a termination violates a clear mandate of public policy is a question of law. *Niesent*, 505 N.W.2d at 783. "[T]he primary sources for declarations of public policy in South Dakota are the constitution, statutes, and judicial decisions." *Johnson*, 433 N.W.2d at 227.

Under this framework, the South Dakota Supreme Court has recognized three public policy exceptions to the at-will employment doctrine. An employer may not terminate an employee in retaliation for: (1) an employee's refusal to commit a crime or other unlawful act; (2) an employee's filing of a worker's compensation claim; or (3) an employee's participation in whistleblowing. *Donohue*, 2023 WL 3646534, at *2 (citing *Johnson*, 433 N.W.2d at 227; *Niesent*, 505 N.W.2d at 784; *Dahl v. Combined Ins. Co.*, 621 N.W.2d 163, 167-68 (S.D. 2001)). The District of South Dakota has also recognized public policy exceptions for: 1) termination in retaliation for exercise of the First Amendment rights to petition the government for redress of grievances when a citizen seeks to use these rights to seek just compensation for property taken by the government; and 2) termination in retaliation for testifying in an official legislative proceeding. *See Emery v. Schneider*, Civ. No. 07-5038-KES, 2009 WL 236686, at *10 (D.S.D. Jan. 30, 2009); *Donohoe*, 2023 WL 3646534, at *4.

In Claim V of Hodges's First Amended Complaint, Hodges alleges that her contract was not renewed and that she was terminated in retaliation for making reports of School of Mines's failure to pay wages. (Doc. 36, ¶ 74). Hodges alleges that "[t]his reprisal and retaliatory discharge violated South Dakota public policy, including but not limited to that embodied in SDCL 60-11-

17.1, which prohibits reprisal and retaliation for requesting payment for wages earned." (Docs. 36, ¶ 76; 54 at 644).

The South Dakota Supreme Court has not addressed whether retaliatory discharge for exercising rights under SDCL 60-11-17.1[4] "violates a clear mandate of public policy." Other than citing to the statute, Hodges provides no discussion or argument as to how the South Dakota Supreme Court would rule on this issue. Accordingly, Hodges has not met her burden showing that the nonrenewal of her contract "violates a clear mandate of substantial public policy." *See Niesent*, 404 N.W.2d at 783.

Even if the South Dakota Supreme Court ruled that retaliatory discharge for exercising one's rights under SDCL 60-11-17.1 is an exception to the at-will employment doctrine, the Court finds that Hodges's actions did not constitute a "complaint," that invoked the protections of SDCL 60-11-17.1. Hodges contends that she "made a complaint" to School of Mines under SCL 60-11-17.1 in two instances: 1) in a March 16, 2020, email to Lingwall stating that she "ha[s] very few hours left to work this week because I am far over the 20 per week average for this pay period up to this point. However, I will likely work some extra hours as I typical (sic) do," and 2) in her April 29, 2020, phone conversation with O'Neill in which she responded to the introduction of her work improvement plan, explained many of the difficulties she had in her working relationship with Lingwall, especially during COVID, and during which she relayed that she had worked more hours than she recorded on her time sheet. (Doc. 54 at 633, 634-35, 652). While the Court was unable to find any other courts that have analyzed what constitutes "making[ing] a complaint," under SDCL 60-11-17.1, the Court finds informative the United States Supreme Court's opinion in *Kasten v. Satin-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011). There, the Court analyzed whether an oral complaint of a violation of the Fair Labor Standards Act is protected conduct under the Act's anti-retaliation provision. The FLSA protects employees who have "filed any complaint.[5]" *Id.* at 7. The Court in *Kasten* concluded that a "complaint" under the FLSA

---

[4] SDCL 60-11-17.1 provides:

No employer may discharge, discriminate, or engage in or threaten to engage in any reprisal, economic or otherwise, against any employee because the employee has made any complaint to the employer, or to the Department of Labor and Regulation, that the employee has not been paid wages in accordance with this chapter or because the employee has made any complaint or is about to institute any proceedings, or because the employee has testified or is about to testify in any such proceedings.

[5] Specifically, the FLSA's retaliation provision states that it shall be unlawful,

could be both oral and written, but that such a complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.* at 15. The Court reasoned that this fair notice is required, in part, because the statute prohibits employers from discharging or otherwise discriminating against an employee "because such employee has filed any complaint." *Id.* The Court stated "it is difficult to see how an employer who does not (or should not) know an employee has made a complaint could discriminate *because* of that complaint." *Id.*

The Court acknowledges that the anti-retaliation provision of SDCL 60-11-17.1 differs slightly from that of the FLSA in that it prohibits employers from discharging employees who have "made any complaint," rather than, as in the FLSA, "filed any complaint." However, like the FLSA, in order for an employer to be liable for retaliatory discharge under SDCL 60-11-17.1, the employer must have discharged the employee "because*"* the employee made "any complaint" of violations of the statute. While the Court will not opine on the exact standard the South Dakota Supreme Court would adopt, the Court finds that the Supreme Court's analysis in *Kasten* is a helpful guide. As the Supreme Court stated in *Kasten*, "it is difficult to see how an employer who does not (or should not) know an employee has made a complaint could discriminate *because* of that complaint." *See Kasten*, 563 U.S. at 14.

The Court finds that no reasonable inference can be made that Hodges's emails to Lingwall and O'Neill place them on actual or constructive notice that she is asserting her rights under SDCL 60-11-17.1. It is clear from Hodges's March 2020 performance evaluation that there were many projects that she sought to do outside of the Termite and Pond Projects (the only projects for which she was being compensated) in order to advance her career. Specifically, Hodges sought to conduct 3 large-scale multi-stage factorial designed experiments for BioCaN, help write 2 proposals for campus research efforts, and submit 2 journal papers as primary author, and seek out and write proposals to obtain grant money to further fund her employment at School of Mines. There is no indication in these emails to Lingwall and O'Neill that Hodges was working more than 20 hours a

---

To discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

week on either the Termite or Pond projects. Lingwall testified that it was his impression that Hodges always included all of the hours in which she was working on her various projects and duties into the 20 hours she recorded on her timecard. (Doc. 53-5, Lingwall Dep. 98:6-25). The Court finds that, in light of the content and context, Hodges's email to Lingwall that she would likely work more than 20 hours on a particular week "as she typical[ly] d[id]," did not place him on notice that she was "making" a complaint under SDCL 60-11-17.1.

In addition, the Court finds that no reasonable inference can be made that Hodges's April 29, 2020, phone conversation with O'Neill placed her on notice that Hodges was making a complaint under SDCL 60-11-17.1. During Hodges's phone conversation with O'Neill, which took place the day after Lingwall had informed her of the work improvement plan, Hodges refuted many of the reasons Lingwall had given her for placing her on a work improvement plan and complained about the many issues she had working with Lingwall throughout her 5-year tenure at School of Mines. Among other things, Hodges stated that Lingwall wanted her to work all of the time including during her anniversary one year, that he gave her no time to decompress, and was "harassing" her about getting back to work even at her graduation party. (Doc. 53-7 at 510). Hodges relayed that no lack of productivity was allowed, even during COVID. (Doc. 53-7 at 510). In addition, she described the various personality and communication-related conflicts that she had with Lingwall over the course of their professional relationship. (Doc. 53-7 at 510-11). Listed among all of these complaints is the fact that she would work extra hours that she did not mark on her timesheet. (Doc. 53-7 at 511). It is clear from O'Neill's notes of the conversation that Hodges was objecting to the implementation of the work improvement plan. The Court finds that no reasonable inference can be made from the content and context of this conversation that Hodges was asserting her rights under SDCL 60-11-17.1.

For these reasons, Board of Regents's Motion for Summary Judgment is granted as to this claim.

If there were any material questions of fact presented in this case, then it should be tried to a jury. Viewing the facts in the light most favorable to Hodges, no material questions of fact were presented. No triable issues of gender discrimination or retaliation are presented as a result of the non-renewal of Hodges's contract.

Accordingly, it is hereby ORDERED that Board of Regents's Motion for Summary Judgment (Doc. 50) is GRANTED.

Dated this 30th day of April, 2024.

BY THE COURT:

_Lawrence L. Piersol_
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

_Matthew Thelen_